*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0340P (6th Cir.)
File Name: 00a0340p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
　　　　*Plaintiff-Appellee,*

　　　　*v.*

Nos. 98-1239/
2298; 99-1616

MANUEL HERNANDEZ
(98-1239/2298), OSCAR SOLIS
(99-1616),
　　　　*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 89-20004—Avern Cohn, District Judge.

Argued: May 5, 2000

Decided and Filed: September 26, 2000

Before: ENGEL, JONES, and COLE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Larry Warner, LAW OFFICE OF LARRY
WARNER, Brownsville, Texas, R. Steven Whalen, Detroit,
Michigan, for Appellants. Jennifer J. Peregord, UNITED
STATES ATTORNEY, Detroit, Michigan, for Appellee.
**ON BRIEF:** Larry Warner, LAW OFFICE OF LARRY

1

WARNER, Brownsville, Texas, R. Steven Whalen, Detroit, Michigan, for Appellants.  Jennifer J. Peregord, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

———————————

## OPINION

———————————

ENGEL, Circuit Judge.  Defendants Manuel Hernandez and Oscar Solis appeal their convictions and sentences for conspiring to possess with intent to distribute marijuana.  For the reasons set forth below, we AFFIRM the judgments against both Hernandez and Solis.

### PROCEDURAL AND FACTUAL BACKGROUND

Manuel Hernandez and Oscar Solis, with Oscar's brother Rey Solis, Jesus "Jesse" Reyna, Jacqlynn Garrett, and Rosa Garcia, were indicted in December 1989 on one count of conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1994).[1]  The trial for all the codefendants except Garcia, whose whereabouts was unknown, took place in October and November 1990.

At trial, the principal government witness was Sammy Joe Walden, an unindicted coconspirator.  Walden, an auto mechanic from the Dallas area, testified that he met Hernandez in 1988 in south Texas.  Hernandez recruited Walden to deliver marijuana to Saginaw, Michigan, promising payment of $70 for each successfully delivered

---

[1] Section 841 makes it unlawful for any person to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," such as marijuana.  21 U.S.C. § 841(a)(1) (1994).  Any person who conspires to commit possession of marijuana with intent to distribute shall be subject to the same penalties as those persons convicted for possession alone. *See* 21 U.S.C. § 846.

*Feinman*, 930 F.2d 495, 500 (6th Cir. 1991); *United States v. Castro*, 908 F.2d 85, 90 (6th Cir. 1990).

   **AFFIRMED.**

We review a sentencing court's factual findings regarding a defendant's role in a conspiracy for clear error. *See Owusu*, 199 F.3d at 345. Whether these facts warrant a sentence enhancement pursuant to § 3B1.1(a) is a legal conclusion subject to de novo review. *See United States v. Gort-DiDonato*, 109 F.3d 318, 320 (6th Cir. 1997). The reviewing court should consider the following factors in making its determination:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 commentary, applic. note 4.

Here the district court adopted the factual findings in Solis's presentence report, which recommended enhancement pursuant to § 3B1.1, stating that "Solis directed codefendants to make payments, took profits from the drug transactions from Saginaw, Michigan back to Texas, paid codefendant's utilities, and was involved in planning and organizing the conspiracy." The government expands upon this list on appeal, noting evidence presented at trial that Solis approved Walden as a courier, met him in Saginaw and asked him to deliver cash back to Texas, and called Reyna and Garrett and visited Saginaw at times contemporaneous with Walden's visits there. Given this evidence, we believe the district court did not err in applying the leadership enhancement. The conspiracy included at least five participants--Oscar and Rey Solis, Hernandez, Reyna, Garrett, and Walden--and the evidence supports the court's conclusion that Oscar Solis was leading or organizing all of them. Solis's conduct was in line with that of other drug conspiracy defendants whose sentences have been enhanced by this court pursuant to § 3B1.1(a). *See Owusu*, 199 F.3d at 346-47; *United States v.*

pound. After Walden agreed to make such a delivery, Rosa Garcia visited his apartment in Weslaco, Texas, in the Rio Grande valley, bringing to him 50 one-pound bricks of marijuana, and gave him a telephone number to call when he reached Saginaw.

Walden further testified that, after driving from Weslaco to Saginaw, he called the phone number Garcia had given him, whereupon a Mexican man answered the phone, said "No comprende English," and hung up. Walden then called Hernandez's beeper, hoping to get Garcia's phone number from Hernandez and then call Garcia to straighten out the confusion. Hernandez returned his call and told him to recall the Saginaw phone number the next morning. After Walden did so, he met "John," his contact for the trip, at a K-Mart store and then followed "John" to a nearby house where he unloaded the marijuana from his van. "John" called someone named "Oscar" to verify the amount of marijuana received in Saginaw and then told Walden he could leave. Walden returned to Texas, where he called Manuel Hernandez to let Hernandez know of his return.

Walden described six other trips that he made from the Rio Grande valley to Saginaw to deliver various quantities of marijuana. During this testimony, the government introduced into evidence registration records from motels either in the Saginaw area or, in some cases, in the Chicago area, where Walden stayed while purportedly making drug deliveries. Walden's testimony and the motel records described a time line for the visits and quantities delivered as follows:

| Visit One: | November 4-5, 1988 | 50 pounds |
|---|---|---|
| Visit Two: | November 14-15, 1988 | 70 pounds |
| Visit Three: | November 21-22, 1988 | 70 pounds |

| Visit Four: | December 1-2, 1988 | 100 pounds |
| Visit Five: | December 6-8, 1988 | 100 pounds |
| Visit Six: | January 6-8, 1989 | 140 pounds |
| Visit Seven: | January 15-17, 1989 | 151 pounds |

Although each delivery involved communications with either Hernandez or Garcia concerning when and where to pick up the marijuana brickloads, other circumstances surrounding the individual deliveries differed. Beginning with Visit Two, Walden's Saginaw contact was Jesus Reyna. Walden delivered the marijuana to the house Reyna shared with his girlfriend, Jacqlynn Garrett, at 1323 South Michigan Street in Saginaw. Before making this trip, Walden met with Garcia and Oscar Solis, who wanted to meet him "because he wanted to know who he was working with." At about this time, Garcia allegedly told him that both she and Hernandez were paid $10 for each pound of marijuana successfully delivered to Saginaw. Reyna told him that Oscar Solis paid for utilities and rental for the house at 1323 South Michigan, furnished Reyna with a car, and paid him for his services.

Walden stated that on his third visit to Saginaw Reyna and Oscar Solis met him at the K-Mart. All three then went to the Reyna/Garrett house, where Walden and Reyna unloaded the marijuana from Walden's vehicle and Reyna and Garrett rewrapped the marijuana bricks with fabric softener sheets. On this visit Solis allegedly asked Walden to deliver $25,000 to Garcia in Texas. During this portion of Walden's testimony, the government introduced records stating that Oscar Solis had stayed at a Saginaw motel the same night,

Walden's trips were not the only evidence available to the trial court. There was admissible testimony from Walden that Solis had been involved in the conspiracy for eight years, that other couriers had been used, and that monthly quantities exceeded 500 pounds. There was also a narcotics record book that showed large quantities of money going back to Texas. Finally, the court had before it evidence that while still at large following his trial in the instant case, Solis had been apprehended during a drug bust in Cameron County, Texas for which he had been sentenced on September 17, 1998, to 18 months for possession with intent to distribute 33 kilograms of marijuana, the amount involved there being approximately 72 pounds. Given this evidence, we believe the total quantity of marijuana attributed by the court to the original coconspirators is supportable and probably conservative.

Solis misapprehends the range and nature of fact-finding responsibilities of the trial court in cases such as this one, especially when the defendant was a leader of a drug distribution conspiracy. The district judge was in no way limited to the 641 pounds which only defined Walden's immediate involvement. Indeed, it could reasonably have chosen an amount substantially larger than that upon which it settled without committing clear error. The wide and varied scope of the other evidence before the trial judge, including evidence of an ongoing conspiratorial activity even before Walden's involvement, is fully convincing that the amount settled upon by the trial judge was well within the permissible range of his fact finding discretion.

### E. Leader/Organizer Enhancement

Finally, Solis argues that the district court erred in enhancing his sentence pursuant to sentencing guideline § 3B1.1(a), which instructs: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels."

to support its finding that the total quantity involved in the conspiracy was at least 1400 pounds.

The only precise evidence we have on how the trial court originally arrived at the 1400 figure comes in directly from Rey Solis' judgment of sentence which includes the following attachment suggesting that factual findings were made on the record:

There was disagreement at sentencing as to the amount of marihuana involved in the conspiracy for which defendant was convicted. The Court, on the basis of testimony at trial, determined that an accomplice made 7 trips to Saginaw, Michigan from the Rio Grande Valley and delivered 200 pounds on each trip. Therefore, 1,400 pounds of marihuana was involved in the conspiracy and that amount should be used in determining relevant conduct.

In review on appeal we may consult the entire record. "A reviewing bench should sustain a sentencing court's factual finding if it was supported by 'some minimum indicium of reliability beyond mere allegation.'" *Dunlap*, 209 F.3d 476, n.8 (quoting *United States v. Robison*, 904 F.2d 365, 371 (6th Cir. 1990) (citations omitted)). "If the exact amount of drugs involved is uncertain, the court may make an estimate supported by competent evidence in the record." *Owusu*, 199 F.3d at 338. Furthermore, both sentencing and reviewing courts may consider relevant information which is prohibited from being introduced into evidence at trial in determining a defendant's sentence. *See United States v. Charles*, 138 F.3d 257, 267 (6th Cir. 1998). Approximations are completely appropriate. *United States v. Maliszewski*, 161 F.3d 992, 1027 (6th Cir. 1998). District courts may approximate the quantity of drugs for sentencing purposes based upon circumstantial evidence as long as they err on the side of caution. *See United States v. Elder*, 90 F.3d 1110, 1127 (6th Cir. 1996).

November 22, as did Walden. Walden also testified that, on his fourth visit to Saginaw, he met Rey Solis, whom he believed was settling a dispute regarding the weight of some marijuana sold to "one of the customers."

During Walden's seventh trip to Saginaw, he was stopped by Missouri State Highway Patrol officers near Springfield, Missouri. The patrolmen searched his vehicle and discovered the marijuana bricks. When Walden told them that he was delivering the marijuana to Michigan, the officers asked him if he would agree to cooperate with authorities, including making a surveilled delivery to Reyna and Garrett. Walden agreed to make the delivery, and Missouri-based officers then accompanied him to Saginaw where, on January 17, federal law enforcement officials, including Saginaw-based Drug Enforcement Administration (DEA) agent Tom Kostecke, interviewed him, wired him, and then sent him to the Reyna/Garrett residence. After Walden, Reyna, and Garrett unloaded Walden's vehicle, officers entered the house and arrested Reyna and Garrett and re-"arrested" Walden. Walden was returned to Texas where he continued to cooperate with federal officials, including testifying before a federal grand jury about the alleged conspiracy.

Walden also described several post-arrest visits with Hernandez. In January 1989, after Walden told Hernandez that he had been arrested in Saginaw, Hernandez told him that Oscar Solis and Rosa Garcia had already informed Hernandez of the Saginaw arrests, and that "Oscar was really upset on it and would probably put a contract out on [Walden]." In June 1990 Hernandez asked him to write a letter denying Hernandez's involvement in any criminal activity. Walden stated that he wrote such a letter, at Hernandez's dictation, and signed it. Finally, in July 1990, Hernandez and Walden met again, and, according to Walden, Hernandez again asked him to sign and have notarized a letter he had written exculpating Hernandez. During this testimony, the government introduced copies of the two letters into evidence.

During cross-examination, Walden denied having any deal with Missouri authorities for immunity from prosecution for possession of the marijuana in exchange for cooperating with federal officials in the conspiracy prosecution. At one point during the cross-examination, the government objected to Walden's reading from a transcript of his grand jury testimony, arguing that opposing counsel had not laid a foundation for use of the testimony either to refresh Walden's recollection or for impeachment. The court took this opportunity to briefly lecture the jury on how prior inconsistent statements could be used in assessing a witness's credibility.

The government also presented testimony from various law enforcement officials. One of the Missouri highway patrolmen testified that Walden had told them he was a bounty hunter when he was first stopped, and that he implicated Oscar and Ray Solis during his initial interview in Springfield. The officer denied having promised Walden that state law charges would not be brought against him if he participated with federal officials in their investigation of the alleged conspiracy. Saginaw County detectives testified as to the search of the Reyna/Garrett residence at the time of their arrest. Through the detectives' testimony, the government introduced into evidence 98 pounds of marijuana bricks recovered from a box and from a crawlspace in the basement of the house; packages of fabric softener; a telephone directory found in the kitchen that included phone numbers for Oscar and Rey Solis; handwritten business records that included the name "Oscar" next to various dollar amounts; and a document of title transfer indicating that a 1977 Mercury automobile parked outside Reyna's house the day of his arrest belonged to Oscar Solis.

The government then presented agent Kostecke's testimony, which consisted in large part of Kostecke recounting what Walden had told him about the alleged conspiracy in the January 17 interview and during another interview in February 1989. At one point during Kostecke's

the conspiracy involved 1400 pounds of marijuana for purposes of relevant conduct. Therefore, the presentence report recommended that Solis be held accountable for 1400 pounds of marijuana, for a base offense level of 28.

At Oscar Solis' sentencing the trial judge stated:

I find that the quantity involved was 1400 pounds of marijuana. That was the quantity found with his codefendants, and I don't see the need to go through an evidentiary hearing. That was determined on the record previously, and I am satisfied that that's the amount that should be ascribed to him.

The quantity of drugs ascribed to Oscar Solis' coconspirators is relevant, but not sufficient by itself to support his sentence. Here, however, direct attribution of the quantities attributed to the coconspirators to Solis is not a problem. There is sufficient evidence in the trial record to support the trial court's determination that Solis was a leader in this drug conspiracy. There is evidence that he was involved in shipping the marijuana, overseeing its distribution, and collecting the profits. Indeed, both Solis brothers were already deeply involved in an ongoing marijuana operation when Walden became involved in the organization in 1988. The Sentencing Guidelines provide that the defendant's relevant conduct, in the case of a jointly undertaken criminal activity, includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" that occurred during the commission of the offense of conviction. U.S.S.G. § 1B1.3. A preponderance of evidence supports the district court's finding that Oscar Solis should at a minimum be held responsible for the same quantity of drugs that was attributed to the others in the conspiracy.

In so doing, we acknowledge that even if Oscar Solis is properly attributed the same quantity of drugs attributable to his codefendants, this does not obviate the trial court's duty

out-of-court statements. This proof and the other evidence presented at the eleven-day trial sufficiently supported Solis's conviction. Solis' trial may not have been perfect, but overall the procedures withstand his due process challenge.

### D. Attribution of 1400 Pounds of Marijuana

Solis next argues that the district court erred in attributing 1400 pounds of marijuana to him in calculating his sentence. We review a district court's drug quantity determination for clear error. *See Owusu*, 199 F.3d at 338. The government must prove the amount to be attributed to a defendant by a preponderance of the evidence. *See United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990). Testimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable. *See United States v. Pruitt*, 156 F.3d 638, 647 (6th Cir. 1998), *cert. denied*, 525 U.S. 1091 (1999), and *cert. denied*, 526 U.S. 1012 (1999).

Two presentence reports were prepared for Oscar Solis. The first report was prepared in 1990. The presentence report noted that informant Walden stated that codefendant Reyna told him that during the conspiracy the Solis brothers were shipping 500 pounds of marijuana per month to Saginaw, and that this had been continuing for the past eight years. Walden also stated that Reyna told him that the Solis brothers also used other couriers to make their marijuana deliveries. Based upon Walden's statements, the presentence report concluded that during the course of the eight year conspiracy, the defendant sold 48,000 pounds of marijuana, placing his base offense level at 36. The presentence report also recommended that Solis be assessed 4 points pursuant to U.S.S.G. § 3B1.1(a) for being an organizer or leader of a criminal activity that involved five or more participants.

A second presentence report was prepared in 1999. It noted that at the time Solis' co-defendants were sentenced, the district court, on the basis of testimony at trial, had ruled that

testimony, counsel for Rey Solis objected to a response from Kostecke that he believed constituted impermissible hearsay. Counsel for the government argued in response that Kostecke's testimony as to what Walden had said in their interviews was allowable pursuant to Federal Rule of Evidence 801(d)(1)(B), and the court overruled the objection.[2] Kostecke further testified that he saw a rental car registered to Oscar Solis outside the Reyna/Garrett residence the day before their arraignment on the indictment. Kostecke also identified telephone records showing calls made from the Reyna/Garrett residence to Oscar Solis, Rey Solis, and Rosa Garcia, some made during the dates Walden testified he was in Saginaw, and some billed to Oscar Solis's telephone credit card.

At the close of the government's case, counsel for all the codefendants, including Manuel Hernandez and Oscar Solis, moved for acquittal pursuant to Federal Rule of Criminal Procedure 29, arguing that the government had presented insufficient evidence to support guilty verdicts against the defendants.[3] The court denied these motions, and the trial continued.

Manuel Hernandez testified in his own defense. He stated that he and his brothers owned and managed a construction company in south Texas, and also owned several convenience stores and apartment buildings. He testified that he met Sam

---

[2] Under Rule 801(d)(1)(B), a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the defendant of recent fabrication or improper influence or motive."

[3] Rule 29 states that "[t]he court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Fed. R. Crim. P. 29(a).

Walden at an automobile auction in Dallas in 1986, and that they became friends. Rosa Garcia worked at one of the convenience stores his company owned; after Hernandez introduced Garcia to Walden, they began seeing each other romantically. Hernandez denied any knowledge of Garcia's or Walden's alleged marijuana trafficking. He admitted knowing Oscar and Rey Solis from childhood, but equivocated as to whether he knew Jesus Reyna. He denied contacting Walden after the issuance of the indictment, asking him to write either of the two exculpatory letters, or making any threat against Walden's life or personal safety. He stated that Walden had dictated the second letter to him, and that Walden was upset that the government had indicted Hernandez. He also testified that Walden had told him that the Missouri officers had promised him immunity from suit before he cooperated with federal officials conducting the investigation in Saginaw.

Jesus Reyna also testified in his own defense. Reyna stated that he and Oscar and Rey Solis were partners in an enterprise promoting Latin music dance parties, and that he first met Rosa Garcia at a party he was promoting in Saginaw in November 1988. Garcia asked Reyna to rent the basement of his home in Saginaw to store marijuana. Reyna agreed to rent the basement for $250 for each marijuana shipment, but did not agree to sell or deliver the marijuana to others. Reyna first met Sam Walden, whom he believed to be romantically involved with Garcia, in November 1988 when Walden made the first marijuana delivery to Reyna's house. He stated that Walden made only three marijuana deliveries to his house, and that neither he nor Garrett helped store the marijuana bricks in the basement or repackage them with fabric softener.

On cross-examination, counsel for the government played a tape recording which Reyna admitted was a recording of a January 7, 1989 telephone conversation between Reyna and Walden in which Reyna said "I waited for you yesterday and they told me you would be here Sunday, so I waited for someone to call. Oscar called me this morning and said, 'No,

Solis claims that the trial court's failure to include in the jury instructions an express instruction that the jury could only consider Reyna's out-of-court statements for their impeachment value, and not for their substance, was such an error. The government admits the error, but argues that it was not plain error. We agree with the government. Although we have in the past found failure to instruct a jury on limitations on the use of prior inconsistent statements plainly erroneous, *see United States v. Lipscomb*, 425 F.2d 226, 227 (6th Cir. 1970), we have done so specifically only where "the testimony brought out during the impeachment process established in large measure the substantive elements of the crime which the government was required to prove." *Id.* As discussed above, in this case the government presented adequate evidence apart from Reyna's out-of-court statements to establish that Solis participated in the marijuana conspiracy scheme. Solis's rights were therefore not substantially violated by the court's failure to state the limiting instruction.

### C. Due Process

Solis also argues that even if the court's errors regarding the use of Walden's and Reyna's out-of-court statements do not themselves require reversal of his conviction, the cumulative effect of such errors deprived him of a trial consistent with constitutional guarantees of due process. As discussed above, the two errors alleged by Solis, taken alone, were not prejudicial. We acknowledge that "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983); *see also Byrd v. Collins*, 209 F.3d 486, 547-48 (6th Cir. 2000) (Jones, J., dissenting) (terming various instances of error "symbiotic" and then stating that "confidence in the outcome of [defendant's] trial must be, and is, seriously undermined"); *Eberhardt v. Bordenkircher*, 605 F.2d 275, 279 (6th Cir. 1979). Notwithstanding, neither Walden's nor Reyna's in-court testimony was rendered inadmissible by the admission of their

own testimony was corroborated in a number of convincing ways by other evidence properly before the jury, including evidence of marijuana retrieved from the basement of the Reyna/Garrett residence; Solis's Saginaw motel and telephone records made contemporaneous with Walden's deliveries; taped recordings of Reyna referring to "Oscar" and business records found in Reyna's home referring to "Oscar"; and records from various automobiles, registered to Solis, parked outside Reyna's home at the time of Reyna's arrest and subsequent arraignment. With or without Kostecke's testimony, the jury could have considered, after Walden's cross-examination, his motive to testify falsely at the time he originally gave Kostecke his statements.

Ultimately, Solis's claim relies upon our construction of the harmless error and plain error standards set forth in Fed. R. Crim. P. 52(a) and (b). As such, his assertion of reversible error must fail.

### B. Prior Inconsistent Statements

Solis next argues that the district court committed reversible error in failing to instruct the jury as to how it could consider agent Kostecke's testimony recounting Jesus Reyna's prior inconsistent statements. At trial Solis neither requested such an instruction nor did he object to the instructions before submission of the case to the jury. We therefore review the jury instructions for plain error. *See United States v. McGee*, 173 F.3d 952, 957 (6th Cir.); *cert. denied*, 120 S. Ct. 146 (1999); *United States v. McCall*, 85 F.3d 1193, 1195-96 (6th Cir. 1996). A plain error analysis, under Fed. R. Crim. P. 52(b), consists of four steps: (a) we must decide whether the district court committed an error; (b) whether the error was plain; (c) whether it affected the defendant's substantial rights; and (d) whether the error "seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Owusu*, 199 F.3d 329, 339 (6th Cir. 2000).

he didn't show up. Well, I hear there was a bad storm.'" Reyna testified that the "Oscar" he referred to on the tape was a partner of Walden's and Garcia's named Oscar Gonzalez, not Oscar Solis, and that any other taped reference to "Oscar" was a reference to Oscar Gonzalez. He admitted having made phone calls to Oscar and Rey Solis, but denied ever having told agent Kostecke that they were involved in the marijuana sales operation in any way. In rebuttal, the government called agent Kostecke back to the stand; Kostecke's testimony consisted of a recounting of a January 1989 interview with Reyna in which Reyna allegedly implicated the Solis brothers in the marijuana distribution operation. Kostecke stated that Reyna told him that he distributed marijuana to buyers in the Saginaw area and held the money for Oscar Solis and Rosa Garcia to pick up and take to Texas. He also testified that Reyna had stated that Oscar had met with Reyna and Walden in December 1988 at the Saginaw K-Mart, and that at that time Oscar gave Walden $25,000 to deliver to Texas.

After the codefendants concluded their cases, counsel for the government and for the codefendants made closing arguments. The court then instructed the jury as to the law applicable to the case, including general instructions on how to consider the evidence. The court did not give the jury a separate instruction on how to consider the testimony of agent Kostecke that Jesus Reyna had made prior statements that were inconsistent with his trial testimony. After deliberations, the jury returned guilty verdicts as to all the codefendants.

The court released defendants Solis and Hernandez on bond pending sentencing. Both Solis and Hernandez failed to appear for sentencing, however, and warrants were issued for their arrest. After Hernandez was apprehended in January 1998 in Texas, the district court sentenced him to 97 months imprisonment, to be followed by four years supervised release. Hernandez filed a timely notice of appeal from the judgment incorporating this sentence. During the pendency of the appeal, Hernandez filed a post-judgment motion in the

district court to supplement the record pursuant to Federal Rule of Appellate Procedure 10(e).[4] Hernandez supported this motion with an affidavit from his appellate counsel stating

> My name is Larry Warner. I am the Attorney for Manuel Hernandez, the Appellant herein.
> On September 15, 1998, I spoke with William A. Brisbois, the trial attorney for the defense. He told me: "During the trial, while the jury was in the box, the Prosecutor said words to this effect, *'All these Mexicans from this same area are drug dealers and crooks';* thereupon, the Defense Lawyer, Mr. Brisbois, said, *'Your Honor, we're all Americans here.'"*

The district court denied this motion. Hernandez appealed the denial, and also moved in this court to correct the record. The government moved to dismiss the appeal, attaching to its motion an affidavit from William Brisbois denying that prosecutors had made the alleged statement or that he had told Larry Warner that they had. On March 16, 1999, another panel of this court denied both Hernandez's motion to supplement the record and the government's motion to

---

[4]Rule 10(e) states
(1) If any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly.
(2) If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded:
    (A) on stipulation of the parties;
    (B) by the district court before or after the record has been forwarded; or
    (C) by the court of appeals.
(3) All other questions as to the form and content of the record must be presented to the court of appeals.
Fed. R. App. P. 10(e).

after a motive to prevaricate had arisen, citing *Tome v. United States*, 513 U.S. 150 (1995), in which the Supreme Court held that out-of-court statements are admissible into evidence under Rule 801(d)(1)(B) only if they were made before a witness has a motive to lie. *See Tome*, 513 U.S. at 155-56. Solis argues that admission of the statements was error because the prior statements in question were made after he had been apprehended by Missouri and federal authorities and comprehended the potential charges against him, and thus not made before Walden possessed a motive to lie. Solis further asserts that the *Tome* rule was expressly recognized by our circuit in *Toney v. United States*, 161 F.3d 404 (6th Cir. 1998).

Assuming the question was somehow properly preserved for appeal under a standard other than review for plain error, we note that the trial judge's ruling was correct at the time it was made. *See generally United States v. Hamilton*, 689 F.2d 1262, 1273 (6th Cir. 1983). Such statements were at the time fully admissible without respect to whether they arose before or after the witness quoted had a motive to lie. The Supreme Court's decision in *Tome* came five years after the trial involved here. Our own circuit's recognition of *Tome* did not come until eight years later. That the defendant Oscar Solis could even presume to raise such an issue is due to the inordinate amount of time which lapsed between the time of trial and this appeal, a lapse of course occasioned by his having absconded for so many years.

Even were we to find error in the court's application of Rule 801(d)(1)(B), such error "is harmless unless it is more probable than not that the error materially affected the verdict." *See Toney*, 161 F.3d 410 (quoting *United States v. Martin*, 897 F.2d 1368 (6th Cir. 1990)). Applying that rule here we are unable to conclude that it was more probable than not that the error materially affected the verdict. Walden had testified extensively and while Kostecke also testified at great length; his testimony introduced essentially nothing new to the case. Walden was extensively cross-examined, and his

same judge both presided over the trial and denied the Rule 10(e) motion, we conclude that the decision to deny the motion was not so plainly unreasonable as to require reversal.[5]

## II. Solis Issues

### A. Prior Consistent Statements

Oscar Solis first assigns as error the admission into evidence of agent Kostecke's testimony recounting what Walden told him about the operation of the conspiracy. The government argues in response that admission of the testimony was not error, and, alternatively, that any error was harmless. The parties also disagree about the standard of review we should apply to decide the issue: Solis seeks de novo review of whether Kostecke's testimony was inadmissible hearsay, while the government argues that, because Solis's counsel failed to object to the testimony, we should review admission of the statements for plain error.

As discussed above, after Walden had testified extensively and been cross-examined, agent Kostecke was questioned concerning a number of conversations which he had both at the time of Walden's arrest and later. Well into the agent's testimony an objection was made by counsel for codefendant Rey Solis which was overruled by the trial judge upon the government's assertions that the statements were not hearsay under Rule 801(d)(1)(B).

Because statements testified to by agent Kostecke were made at various times after Walden's arrest, Solis now contends that they were inadmissible as having been made

[5]Hernandez argues that the alleged comment, if it did occur, was reversible error requiring a reversal of the judgment against him. Although we may well agree with Hernandez on this point, *cf. United States v. Withers*, 602 F.2d 124, 125-27 (6th Cir. 1979), we also agree with the government that the question is not before us at this time.

dismiss Hernandez's appeal from the district court's denial of the similar motion. The panel ordered Hernandez's appeal from the court's denial of his Rule 10(e) motion consolidated with his appeal from the district court judgment.

Oscar Solis was apprehended in September 1998. The district court sentenced him to 188 months incarceration, to be followed by five years supervised release. As part of its sentencing determination, the court accepted the findings in Solis's presentence report that the codefendants in the conspiracy were accountable for 1400 pounds of marijuana, which, under the Sentencing Guidelines, gave Solis a base offense level of 28. The court increased this base level by four levels pursuant to guideline § 3B1.1(a) because Solis was a leader or organizer in illegal activity involving five or more participants. Solis timely appeals from this final judgment.

## DISCUSSION

### I. Hernandez Issues

### A. Sufficiency of Evidence

Hernandez first argues that the district court erred in denying his Rule 29 motion for acquittal for insufficient evidence. We generally review sufficiency-of-the-evidence claims by determining whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the elements of the crime beyond a reasonable doubt. *See United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir. 1998) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). As the government notes, however, in this case Hernandez moved for acquittal only at the close of the government's case, and did not renew the motion at the close of all evidence. Under such circumstances, our review is generally limited to determining whether there was "a manifest miscarriage of justice." *See Abdullah*, 162 F.3d at 903. "A 'miscarriage of justice' exists only if the record is 'devoid of evidence pointing to guilt.'" *Id.* (quoting *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998)).

In this case, the record contains ample evidence pointing to Hernandez's guilt. There was no miscarriage of justice requiring reversal.

The government presented the testimony of Sam Walden, who testified as to Hernandez's role in the marijuana distribution scheme; testimony from various law enforcement officials verifying Walden's statements regarding his coconspirators; telephone records showing Hernandez's calls made to Walden in Saginaw and to the Reyna/Garrett residence; and the post-indictment letters that Hernandez either wrote or dictated that purported to exculpate himself from the conspiracy. The jury could have drawn inferences from this evidence that Hernandez agreed with his coconspirators to assist in the possession and distribution of the marijuana seized in Saginaw. On appeal, Hernandez attacks Walden's credibility, noting Walden's participation in authoring the exculpatory letters and his alleged expectation of immunity from suit in Missouri in exchange for his testimony here. Although the government's case relies in large part on Walden's testimony, counsel for the codefendants presented these arguments at trial and the jury chose to believe the government's version of events. Sufficiency-of-the-evidence appeals are "'no place . . . for arguments regarding a government witness's lack of credibility.'" *United States v. Talley*, 164 F.3d 989, 996 (6th Cir.) (quoting *United States v. Adamo*, 742 F.2d 927, 934-35 (6th Cir. 1984)), *cert. denied*, 526 U.S. 1137 (1999).

Hernandez also argues that this court should make a separate determination of the "factual" insufficiency, as opposed to the "legal" insufficiency, of the evidence against him. He claims that such review, which he asserts would result in a decision that his guilty verdict was "against the great weight of the evidence presented at trial so as to be clearly wrong and unjust," is necessary in this case to provide meaningful appellate review. In essence, Hernandez invites us to reweigh the evidence. Hernandez's failure to so move in the district court bars our consideration of the issue on

appeal. *Cf. Dixon v. Montgomery Ward*, 783 F.2d 55, 55 (6th Cir. 1986). Even had he done so, our role on appeal would be to examine the evidence to determine whether the district court's ruling was a clear and manifest abuse of discretion. *See United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). Plainly, it was not. Regardless, we will not review a judgment where the trial court had no chance to make such a determination.

### B. *Motion to Correct the Record*

Hernandez also appeals the district court's denial of his motion to correct the record pursuant to Federal Rule of Appellate Procedure 10(e). When a district court settles a dispute about what occurred in proceedings before it, the court's determination is conclusive unless intentionally false or plainly unreasonable, *see United States v. Zichettello*, 208 F.3d 72, 93 (2nd Cir. 2000); *United States v. Garcia*, 997 F.2d 1273, 1278 (9th Cir. 1993); *United States v. Serrano*, 870 F.2d 1, 12 (1st Cir. 1989); *United States v. Mori*, 444 F.2d 240, 246 (5th Cir. 1971), this because "[u]ltimately the [District] Court has direct knowledge of what the parties [stated in the] case and of what the Court's own general procedures are." *United States v. Barrow*, 118 F.3d 482, 487-488 (6th Cir. 1997). In denying Hernandez's Rule 10(e) motion, the district court agreed with the arguments put forth by the government in its response to the motion. The government asserted that the alleged offensive comment did not appear in the trial transcript; that counsel for Hernandez failed to support any contention that the statement might have been left out of the transcript with citation to the appropriate transcript section where the comment might have occurred; that Hernandez's appellate counsel's affidavit as to what his trial counsel said that the government attorney said was hearsay and thus incompetent evidence of prosecutorial misconduct; and that, since the alleged comment was not recorded in the trial transcript, if it occurred it may have happened outside the jury's earshot, and so did not serve to prejudice Hernandez. For these reasons and, because the