**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0052n.06

Case No. 14-6398

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 27, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | KENTUCKY |
| DERRICK LAVON HERRING, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: DAUGHTREY, COOK, and WHITE, Circuit Judges.

COOK, Circuit Judge. A jury convicted Derrick Lavon Herring of conspiracy to distribute oxycodone in violation of 21 U.S.C. §§ 841(a)(1) and 846. The district court sentenced Herring to 168 months of imprisonment and four years of supervised release. Herring appeals both his conviction and sentence, and we affirm.

I.

Jody Gibson telephoned the police to report a theft of drugs and money. When the police arrived, Gibson admitted to trafficking drugs and to regularly purchasing oxycodone pills from a man he knew as "George"—an alias used by Herring. Believing that Herring orchestrated the robbery, Gibson agreed to participate in a controlled purchase to catch Herring.

On the day of the sting, with surveillance equipment in place, Gibson alerted the police when the man he knew as "George" pulled into his driveway. Herring entered Gibson's

residence as the police listened in on the transaction. When Gibson spoke the prearranged signal-words, the police swarmed the building and arrested Herring. A grand jury charged him with conspiracy to distribute oxycodone.

At trial, Gibson testified that his drug transactions with Herring began two to three months before Herring's arrest. Once or twice a week Herring would meet Gibson and sell him between 200 and 300 oxycodone pills. Gibson testified that he had seen Herring carrying as many as 800 pills at one time. Gibson personally used some of the pills and sold the rest. At times, Herring "fronted" Gibson pills, allowing Gibson to repay this debt as his own customers paid him. Herring also provided Gibson with a money counter to facilitate payments Gibson received from his own customers. On one occasion, Gibson held $30,000 for Herring.

Herring also gave Gibson two lockboxes to keep in his house for Herring to use in drug sales to customers other than Gibson. The pill-exchange scheme anticipated a dual key system: the lockbox customer would have one key, and Herring would keep the other key to each box. One of Herring's regular customers, Charles Oiler, testified that Herring offered him a key but that he refused. And though Herring told Gibson that an unnamed woman would have the key to the other lockbox, Kim Clemons—the only woman who testified—admitted to buying drugs from Herring but never addressed the lockbox scheme. Ultimately the lockboxes were never used.

A jury convicted Herring of conspiracy to distribute oxycodone. The judge found Herring accountable for 8,000 30-milligram oxycodone pills, applied a leadership enhancement, and sentenced him to 168 months of imprisonment and four years of supervised release.

II.

Herring appeals, urging reversal of his conviction on two grounds: (1) the evidence was insufficient to establish a conspiracy, and (2) the prosecutor improperly appealed to the jurors' community conscience.

1. *Sufficiency of the Evidence to Sustain a Conviction for Conspiracy*

Although the government devotes some of its briefing to the view that Herring failed to preserve his sufficiency objection by not renewing his Rule 29 motion at the close of all evidence, we decide under the de novo standard that the government presented evidence sufficient to convince a rational juror that Herring conspired with others to distribute oxycodone. *See United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013).

Herring argues that his dealings with Gibson, Oiler, and Clemons were a series of distinct, arms-length transactions, not a conspiracy to distribute. True, "a buyer-seller relationship is not alone sufficient to [establish] a conspiracy," but one may exist "where there is additional evidence beyond the mere purchase or sale." *United States v. Anderson*, 89 F.3d 1306, 1310 (6th Cir. 1996) (citations and internal quotation marks omitted). Evidence of repeat purchases involving large quantities of drugs can support an inference of a conspiracy, *see United States v. Martinez*, 430 F.3d 317, 332–33 (6th Cir. 2005), and the trust involved in "fronting" drugs to a buyer can also demonstrate that a relationship is more than buyer-seller, *see United States v. Lopez-Medina*, 461 F.3d 724, 747 (6th Cir. 2006).

Herring's argument fails to account for Gibson's testimony concerning their arrangement. Indeed, at one point, Gibson held over $30,000 in cash for Herring and the pills were so plentiful that the two had trouble finding enough places to hide them at Gibson's house. The "fronting" of and delayed payments for drugs evidences Herring's knowledge of and acquiescence in Gibson's

reselling and thus cements this as a robust case of conspiracy. Oiler, too, testified that he resold Herring's pills. And, of course, the lockbox scheme and the gifted money counter affirm Herring's understanding and affirmation of the enterprise nature of his drug operation. A rational fact-finder presented with this evidence could readily infer each of the elements of a conspiracy to distribute.

2. *Improper Appeal to Jurors' Community Conscience*

Herring also contends that the prosecutor improperly appealed to the jurors' community conscience when in closing argument he said:

> Ladies and gentlemen, these little blue pills, oxycodone pills, are devastating our communities in southeastern Kentucky. We're inundated with prescription pill abuse. You can watch it on the news, read it in the papers, and we see it in our streets and in our communities. And the defendant, Mr. Derrick Herring, is part of this problem. It's impacting every aspect of our society. It impacts our economy, our healthcare system, and on an even more fundamental level, it impacts the relationships that we have with other people, including our families. It tears them apart. And you've had the opportunity to hear testimony from some people that have been impacted by this abuse and this addiction; Jody Gibson, Charles Oiler, Ms. Kim Clemons. And I don't say these things to try to stir up sympathy for these people. The fact of the matter is that they've made a series of bad choices to engage in this lifestyle and to be part of this abuse and this addiction history and to use these substances, and they'll have to answer for that in some way or form at some point in time.
>
> But frankly, that's not what we're here to decide today. And that's not the question before you. The sole issue that you have to decide is whether or not the defendant, Mr. Herring, or George, or whatever he wants to call himself, conspired with or agreed with these folks and others to distribute these pills and was part of this problem. And I would submit to you that the evidence establishes that he was, and he was part of this conspiracy.
>
> * * * * *
>
> [Y]ou can't have street[-]level dealers, you can't have these drug addicts without first having a source of supply. And that's exactly what Mr. Herring was. Without people like him and others that are bringing these drugs in their area, you wouldn't have people like Jody Gibson that was distributing them to individuals at street level. And it's driven by greed and profit. And that's why the plaintiff and law enforcement try to focus their efforts. A term we use sometimes is

cutting off the head of the snake. They try to go after the ring leaders or the higher people in these organizations, these sources of supply. . . . [S]ometimes [offering plea deals to lower-level dealers] is a necessary evil as a way to move up the food chain and get to these sources, and that's exactly what they did here. They went after the source of supply.

Because Herring failed to object to these remarks at trial, we review for plain error. Fed. R. Crim. P. 52(b). Prosecutorial misconduct may be so flagrant as to constitute plain error, but reversal is appropriate "only in exceptional circumstances in which the error is so plain that the trial judge . . . [was] derelict in countenancing it." *United States v. Henry*, 545 F.3d 367, 376–77 (6th Cir. 2008) (quoting *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)). To evaluate flagrancy, we consider "(1) whether the prosecutor's remarks or conduct tended to mislead the jury or prejudice the accused; (2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately made; and (4) the overall strength of the evidence against the accused." *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005).

While we afford prosecutors "wide latitude . . . during closing arguments," *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011), misconduct occurs when a prosecutor "direct[s] the jurors' desires to end a social problem toward convicting a particular defendant." *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991). Prosecutors may not press the jury to "send a message to all [criminals] in the community by convicting the defendant," *United States v. Ghazaleh*, 58 F.3d 240, 246 (6th Cir. 1995), because "[t]he amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear." *Solivan*, 937 F.2d at 1153 (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984)).

The prosecutor's argument in this case clearly was improper. His opening remarks focused upon Herring's contribution to a regional drug problem, analogized Herring to a snake, and, contrary to the proscriptions set forth out in *Solivan*, explained how targeting and convicting

Herring and people engaged in similar activities would help address the area's oxycodone problem. Although the prosecution argument did not promise that convicting Herring would *eliminate* the plague of oxycodone sales and addictions, the prosecutor did emphasize that there could be no drug dealers or drug addicts without supply sources, and that Herring was just such a supply source who should be targeted and removed from society.

Given the impropriety of the prosecutor's argument, it is incumbent upon us to determine whether that misconduct was so flagrant as to constitute plain error. Our evaluation of the four flagrancy factors outlined in *Barnett* leads us to conclude that this is not the exceptional circumstance requiring a new trial. Even if the unfortunate remarks were prejudicial, misleading, and deliberately made, they were neither extensive nor repeated. Moreover, in light of the overwhelming evidence of Herring's guilt, there is little chance that the comments influenced the verdict reached by the jury. Consequently, Herring is not entitled to a new trial based upon the prosecution's closing argument.

III.

Herring also challenges his sentence on two grounds: (1) the drug-quantity determination was erroneous, and (2) the leadership enhancement was misapplied.

1. *Erroneous Drug-Quantity Finding Resulting in a Procedurally Unreasonable Sentence*

First, Herring claims that the district court erred in attributing 8,000 30-milligram oxycodone pills to him, thereby miscalculating his guidelines range and leading to a procedurally unreasonable sentence. We review for clear error a district court's drug-quantity determination, with a key factor being the "extent to which the court identified the evidence upon which it relied in making [its] calculation." *United States v. Henley*, 360 F.3d 509, 514–15 (6th Cir. 2004). Drug-quantity approximations are appropriate and not clearly erroneous if they are "supported by

competent evidence" and "err on the side of caution." *United States v. Hernandez*, 227 F.3d 686, 699 (6th Cir. 2000).

Here, the district court supported its approximation by reference to the following: testimony that Herring gave Gibson approximately 500 pills once or twice a week for twelve to sixteen weeks; testimony that Herring held over 600 pills when arrested; the Presentence Investigation Report's statement that Gibson told law enforcement that he once saw Herring with over 2,000 pills; and Herring's testimony that he possessed $30,000 for deposit at one time. From this evidence, the district court calculated the plausible pill-quantity range as between 6,000 (500 pills per week over 12 weeks) and 16,000 (1,000 pills per week over 16 weeks). The district court settled on 8,000 pills, which was the presentencing report's proposed figure, noting that it was consistent with the record and at the low end of the range.

The record shows that the district court based its reliance on the 500-pill figure on an incorrect statement by the government at sentencing. The government told the district court that "what [Gibson] testified to at trial was that it was 500 pills once or twice a week." But at trial, Gibson testified that Herring would deliver "200 to 300" pills "[p]robably twice a week," although "sometimes [Herring] would leave more than that." The 500-pill figure came from the trial testimony of Daryl Kegley, a detective in the Pulaski County Sheriff's Office, and from the Presentence Investigation Report. According to Kegley, Gibson said that Herring would come "one or two times a week" and would "deliver around 500 pills usually." In general, the district court's calculations followed the Presentence Investigation Report, even when it deviated from the trial testimony. For example, the government represented that Gibson initially told law enforcement that Herring delivered pills over a "three- to four-month time frame," but Gibson testified at trial that he first met Herring "probably around September or October" or "[i]t could

have been August." Given the arrest date in November, Gibson's testimony supports a finding of a two- to three-month range—at most, a reasonable upper bound would be three-and-a-half months—rather than the three- to four-month range in the Presentence Investigation Report.

However, the district court's calculation of a base offense level of thirty is supported by even a relatively conservative approximation derived from the evidence in the record. Oiler testified to purchasing 1,000 to 2,000 pills from Herring, Clemons testified to purchasing 200 pills, and Herring had 648 pills when he was arrested. The most conservative estimate would attribute 1,848 pills to Gibson based on this evidence. In addition, Gibson testified that Herring delivered 200 to 300 pills "[p]robably twice a week" over the course of two to three months, and Kegley testified that Herring delivered the pills once or twice per week. Making a conservative estimate of 1.5 deliveries each week and 250 pills per delivery over ten weeks, the trial testimony supports that Herring gave or sold Gibson at least 3,750 pills over the course of their relationship. Combined, this conservative calculation supports a finding of 5,598 pills, which would still result in a base offense level of thirty.[1]

Herring also faults the district court for relying on Gibson's unreliable and unverifiable testimony in determining the quantity of pills involved. Yet, testimony from a coconspirator "may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable," and we afford district courts "great deference" in credibility determinations regarding such testimony. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) (citation

---

[1] Under the guidelines, the base offense level for a defendant convicted of oxycodone distribution is set by reference to the guideline range for an equivalent amount of marijuana. The district court calculated a base offense level of thirty for the equivalent of 1,000 to 3,000 kilograms of marijuana. U.S.S.G. § 2D1.1(c)(5). One gram of oxycodone is equivalent to 6.7 kilograms of marijuana, *id.* § 2D1.1 cmt. n.8(D), so the relevant oxycodone range is 149 to 448 grams. Here, a quantity of 5,598 thirty-milligram pills converts to 168 grams of oxycodone, which is enough to fall within the same thirty-level range calculated by the district court.

and internal quotation marks omitted). Though Gibson's testimony wavered on specifics, he consistently implicated Herring as regularly providing large quantities of pills to him for many weeks. Deferring, as we must, to the district court's acceptance of Gibson's testimony as the foundation for its calculation, it passes muster as not clearly erroneous.

Herring further argues that caution should have led the court to attribute fewer than 8,000 pills to him. Although district courts should "err on the side of caution" when relying on circumstantial evidence to calculate drug quantities, *Hernandez*, 227 F.3d at 699, Herring points to no case requiring that a court select the lowest possible approximation. And we consistently uphold approximations supported by competent evidence. *See e.g.*, *Hernandez*, 227 F.3d at 699; *United States v. Ward*, 68 F.3d 146, 149–51 (6th Cir. 1995). Because the district court's figure satisfies this standard, we find no clear error.

### 2. *Misapplication of Leadership Enhancement*

Next, Herring challenges the district court's application of a two-level sentence enhancement for his leadership role in the conspiracy, pursuant to U.S.S.G. § 3B1.1. A defendant qualifies for this enhancement if "he has exercised decisionmaking authority, recruited accomplices, received a larger share of the profits, was instrumental in the planning phase of the criminal venture, or exercised control or authority over at least one accomplice." *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (citing *United States v. Lalonde*, 509 F.3d 750 765–66 (6th Cir. 2007)). Because this appeal is the first objection Herring has raised to the enhancement, we review for plain error. *United States v. Vonner*, 516 F.3d 382, 385–86 (6th Cir. 2008).

Though Herring correctly maintains that no defendant earns a U.S.S.G. § 3B1.1 enhancement solely because he bought or sold drugs, *see United States v. Schultz*, 14 F.3d 1093,

1099 (6th Cir. 1994), Herring's behavior goes beyond transacting drugs and demonstrates his exercise of authority over Gibson. Herring supplied Gibson with a money counter to track fronted drug proceeds; recruited him to deposit $30,000 into a checking account; and spearheaded a lockbox scheme that, though unsuccessful, would have used Gibson to hold drugs and cash for other dealers in the area. Accordingly, we find that the district court did not plainly err in applying the leadership enhancement at sentencing.

Discerning no reason to reverse the conviction or sentence, we AFFIRM.