NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0358n.06

Nos. 21-1564/1588

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 30, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| RICHIE LEE EDMONDS, III (21-1564); | ) | MICHIGAN |
| JENNIFER LYNNE DAVIS (21-1588), | ) | |
| Defendants-Appellants. | ) | OPINION |
| | ) | |

Before: GIBBONS, ROGERS, and MURPHY, Circuit Judges.

ROGERS, Circuit Judge. The defendants in this case each participated in a conspiracy to distribute heroin and fentanyl in Michigan. After defendant Keenan Dunigan was arrested in connection with that distribution, Dunigan began directing the other defendants to continue operating the drug operation. Defendants Richie Edmonds, III and Sierra Singleton-Moore retained possession of the supply of heroin and continued to provide defendant Jennifer Davis with quantities of heroin to sell. After the Government conducted several controlled buys, the four defendants were indicted and each pleaded guilty pursuant to a plea agreement. Edmonds and Davis appealed, challenging different aspects of their respective sentences. Edmonds argues that the district court improperly determined that he was a career offender based on his prior controlled-substance offenses. Davis asserts that she was entitled to a minor-role reduction to her offense level and that she was improperly held responsible for 250 grams of heroin purportedly pictured

and described in a text from Dunigan. For the reasons set forth below, the district court properly rejected both Edmonds's and Davis's arguments.

In September 2019, law enforcement executed a search warrant at Keenan Dunigan's residence that resulted in the seizure of a firearm, ammunition, cash, and 45.35 grams of a mixture of heroin and fentanyl. Dunigan was charged in state court in connection with that search and was released on bond. At least as early as December 5, 2019, Dunigan began residing with Jennifer Davis at her residence in Battle Creek, Michigan, and he enlisted her to deliver heroin to one of his regular customers, Travis Thompson. Thompson bought heroin from Davis on approximately ten occasions in quantities of about .25 to .50 grams at a time. Near the end of 2019, Dunigan moved out of Davis's Battle Creek residence, and in January 2020, he began staying at Richie Edmonds and Sierra Singleton-Moore's residence in Kalamazoo, Michigan.

Dunigan continued to sell heroin after he began residing with Edmonds and Singleton-Moore. In the early morning hours of January 14, 2020, Dunigan had been exchanging text messages with Davis when he sent her a message saying "I'm broke now I just re up I bought a quarter brick" along with an accompanying picture of what appeared to be a large quantity of heroin in a plastic bag on the floor of Edmond's and Singleton's residence. Davis did not directly respond to the message concerning the drugs, but she continued texting Dunigan.

During the early hours of January 14, 2020, Dunigan sent text messages to customers to see if they wanted to purchase heroin. One of those customers, P.S., purchased heroin from Dunigan, and subsequently passed away from fentanyl ingestion after using the heroin mixture purchased from Dunigan.

Dunigan also communicated with Thompson on January 14, 2020, to coordinate a heroin sale. Dunigan entered Thompson's vehicle for the exchange, and law-enforcement officers

subsequently conducted a traffic stop on the vehicle where they recovered heroin and $60. Thompson told the officers that he had met Dunigan to purchase $60 of heroin, and Dunigan was arrested. During the arrest, Dunigan managed to slip out of his handcuffs and drove away in a law-enforcement vehicle. Officers pursued Dunigan and successfully arrested him after tasing him.

After Dunigan had been taken to the county jail, he began making phone calls to Davis, Edmonds, and Singleton-Moore to direct them on how to continue the drug business. Dunigan first called Edmonds to inform Edmonds that he would need to take over the drug operation, and Dunigan explained details of the drug operation, such as drug pricing and how to cut the heroin. Dunigan instructed Edmonds to keep the heroin at his residence and to provide quantities for Davis to sell in Battle Creek. On another jail call the next day, however, Dunigan suggested that it may make more logistical sense for Davis to hold the stash of heroin and for Edmonds to drive to Davis because Edmonds had a more reliable car. In this situation, Davis would have the supply, and Edmonds would travel to get 20–30 grams from Davis at a time.

While in jail, Dunigan continued to discuss heroin sales with Edmonds, Singleton-Moore, and Davis. On January 15, 2020, Thompson showed up at Davis's house while Davis was on the phone with Dunigan, and Thompson purchased heroin from Davis both at that time and again later that day. The next day, Dunigan spoke with Davis about several heroin customers. Using a confidential source, officers also conducted several controlled purchases of heroin from Singleton-Moore. After conducting multiple controlled buys, law enforcement obtained a search warrant for Edmonds and Singleton-Moore's residence. At that residence, officers recovered $1,900, 12.92 grams of a mixture of heroin and fentanyl, a digital scale, and sandwich baggies. Edmonds, Singleton-Moore, and Davis were subsequently arrested and charged with the

distribution of heroin and fentanyl and participating in a conspiracy to distribute heroin and fentanyl.

Davis and Edmonds each pleaded guilty to their respective distribution charges pursuant to plea agreements. Neither of their plea agreements contained an agreement as to the appropriate sentence, and both defendants had contested sentencing hearings.

Edmonds's final presentence investigation report (PSR) recommended that he be classified as a career offender based on one prior crime-of-violence conviction and two prior controlled-substance convictions. At his sentencing, Edmonds argued that his Michigan convictions for delivery/manufacture of marijuana did not qualify as controlled-substance offenses under USSG §4B1.1(a). The district court overruled Edmonds's objection to the classification as a career offender because Edmonds's argument was supported only by non-binding precedent. Edmonds was sentenced to 120 months' imprisonment. Edmonds timely appeals.

Davis's final PSR attributed 252.5 grams of heroin to Davis based on her selling Thompson 2.5 grams of heroin and the photograph she received from Dunigan purportedly depicting 250 grams of heroin. At the sentencing hearing, a Government witness explained that Dunigan's referring to a "quarter brick" in his text to Davis was slang for a quarter of a kilogram of heroin. Davis objected to the drug quantity, arguing that she never personally saw the bag of alleged heroin and questioning whether Dunigan actually possessed such a quantity. She also argued that she should receive a minor-role reduction pursuant to USSG §3B1.2. The district court rejected both arguments. First, the district court concluded that Davis was involved "just as extensively as Mr. Edmonds and Ms. Singleton-Moore in the distribution of these drugs." Second, the district court concluded that the Government had shown by a preponderance of the evidence that Davis should

be held responsible for 252.5 grams of heroin. The district court then sentenced Davis to 57 months' imprisonment, the low end of her guideline range. Davis timely appeals.

Edmonds appeals the district court's determination that he had two prior controlled-substance offenses, but his argument on appeal is foreclosed by our recent published decision in *United States v. Clark*, 21-6038, 2022 WL 3500188, __ F.4th __ (6th Cir. 2022). In short, Edmonds argues that his prior convictions occurred when the definition of marijuana included hemp and, now that both Michigan and federal law exclude hemp from the definition of marijuana, his convictions cannot be considered controlled-substances offenses using the categorical approach. This argument depends on whether USSG §4B1.1(a) requires application of the controlled-substance schedules in effect at the time of the federal sentencing to determine that a prior conviction qualifies as a controlled-substance offense. In *Clark*, we squarely rejected that argument and concluded that §4B1.1(a) requires courts to determine whether a prior conviction qualifies as a controlled-substance offense based on the controlled-substance schedules in effect at the time of the prior conviction rather than at the time of federal sentencing. *Clark*, 2022 WL 3500188, at *2–8. This disposes of Edmonds's only argument on appeal. The district court did not err in determining that two of Edmonds's prior convictions qualified as controlled-substance offenses under §4B1.1(a), and the district court therefore properly classified Edmonds as a career offender.

Turning to Davis's appeal, she first challenges the district court's refusal to apply a minor-participant reduction to her offense level under USSG §3B1.2. Because a preponderance of the evidence supported the district court's determination that Davis played an average role in the conspiracy, the district court did not err in refusing to apply the minor-participant reduction to Davis's offense level. The district court relied on evidence that Davis was aware that Dunigan

was distributing heroin out of her residence in December 2019 and that Davis operated the distribution of heroin mainly to the conspiracy's Battle Creek customers. Further, the district court relied on evidence that Davis expressed a willingness to run the heroin operation and that Dunigan told Edmonds that all the heroin could be moved to Davis's house if necessary. This evidence supports the determination that Davis played a role in the conspiracy similar to that of Edmonds and Singleton-Moore. A minor participant under §3B1.2 "is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." USSG §3B1.2 cmt. n.5. The district court's factual determination must be upheld unless clearly erroneous, *United States v. Randolph*, 794 F.3d 602, 616 (6th Cir. 2015), and the district court did not clearly err when it declined to apply the minor-participant reduction in §3B1.2 to Davis's offense level.

Davis offers two factual arguments that she was a minor participant, but both are undermined by the evidence presented at the sentencing hearing. First, Davis argues that she played a limited role related to "distributions that she made when she was directed to make them by codefendant Dunigan." This argument is undermined by the fact that Davis told Dunigan in one of the jail calls that Edmonds had been asking her for advice about the business, and Davis told Dunigan "[y]ou showed me enough. I paid attention. Just know that. If I could tell you anything, just know that." Thus, the Government presented evidence that Davis was knowledgeable about how to run the drug operation and that her role went beyond simply completing heroin sales as directed. Second, Davis argues that she was a minor participant because her residence was not searched for drugs. The logic of this argument—that Davis played a minor role because the heroin was not actually stored at her house—is undermined by the evidence that Dunigan trusted Davis enough to consider storing the heroin at Davis's residence. Thus, the fact

that Davis did not end up holding the supply of heroin does not suggest that Davis played a minor role in the conspiracy. In sum, Davis has not shown that the district court clearly erred when it declined to apply a minor-participant reduction to Davis's offense level.

Davis next argues that the district court erred by holding her responsible for 250 grams of heroin. Because the Government presented evidence that Davis knew Dunigan had acquired 250 grams of heroin to distribute, the district court did not clearly err by attributing that amount of heroin to Davis. The final PSR indicated that Davis had been helping distribute heroin both before and after Dunigan had been arrested. Further, at the sentencing hearing, the Government presented text messages from Dunigan to Davis indicating that Davis had actual knowledge of Dunigan's purchase of 250 grams of heroin to distribute. A "'defendant may be sentenced based upon quantities of drugs attributable to other members of a conspiracy, provided the district court finds that those quantities were known . . . or were reasonably foreseeable' to the defendant." *United States v. Tisdale*, 980 F.3d 1089, 1097 (6th Cir. 2020) (quoting *United States v. Moss*, 9 F.3d 543, 552 (6th Cir. 1993)). The district court could therefore attribute the 250 grams of heroin to Davis because the evidence showed that Davis participated in Dunigan's drug distribution scheme and Davis knew Dunigan had purchased 250 grams of heroin to distribute.

Davis contends that she should not be held responsible for the 250 grams of heroin for two reasons, but neither is persuasive. First, Davis asserts that she never possessed the 250 grams of heroin. This contention is immaterial because, as discussed above, Davis can be held responsible for quantities of heroin that were reasonably foreseeable to her. Moreover, by participating in Dunigan's distribution of heroin, it would have been reasonably foreseeable to Davis that Dunigan purchased the heroin so that it could be distributed by the members of the conspiracy.

Second, Davis asserts that the photograph and text messages are not reliable evidence that Dunigan actually purchased 250 grams of heroin to be distributed by the members of the conspiracy, and Davis suggests that she doubted Dunigan purchased that much heroin. The photograph, however, appears to depict a large quantity of heroin that Dunigan himself identified as a "quarter brick," which the Government witness explained is slang for a quarter of a kilogram of heroin. Davis acknowledges that the background of the photograph matches the tile in Edmonds's residence where Dunigan was staying. Thus, the evidence supports the conclusion that Dunigan actually possessed the contents depicted in the photograph. Further, the evidence strongly suggests that the contents in the photograph were heroin because Dunigan texted customers about buying heroin right after he sent the photograph to Davis, and the Government's witness testified that the color of the heroin sold to P.S. that night was consistent with the heroin depicted in the photograph. The evidence was sufficient to show by a preponderance of the evidence that Dunigan had purchased 250 grams of heroin when he texted Davis. The Government need only prove the amount of drugs attributed to Davis by a preponderance of the evidence, *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000), and we review the district court's determination of drug quantity for clear error, *United States v. Smith-Kilpatrick*, 942 F.3d 734, 746 (6th Cir. 2019). The district court here did not clearly err by attributing 250 grams of heroin to Davis during her sentencing.

For the foregoing reasons, the district court's judgment is affirmed.