**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John Curtis ROBERTSON; George T. Rorrer; and Keith Floyd, Defendants–Appellants.**

**United States of America, Plaintiff–Appellee Cross–Appellant,**

v.

**George T. Rorrer, Defendant–Appellant Cross–Appellee.**

Nos. 00–6752, 01–5307, 01–5021.
No. 01–5111.

United States Court of Appeals,
Sixth Circuit.

May 9, 2003.

Before BATCHELDER and COLE, Circuit Judges; and GRAHAM, District Judge.*

BATCHELDER, Circuit Judge.

Defendant Keith Floyd ("Floyd") was convicted by a jury of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. He argues that the district court erred by finding that there was sufficient evidence to convict him; that the sentence he received violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); that the court erred by failing to credit him with 48 months of imprisonment under USSG § 5G1.3(b); and that the court erred by refusing to grant him a three-level reduction under USSG § 3E1.1(b). Finding no merit to his claims, we will affirm the judgment of the district court.

Defendant John Curtis Robertson ("Robertson") was convicted by a jury of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, and with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He argues that the district court erred by increasing his offense level by two levels under USSG § 2D1.1(b)(1); that the sentence he received violated *Apprendi*; that the court erred by finding his cocaine amount by a preponderance of the evidence, rather than by clear and convincing evidence; and that the court erred by finding adequate the affidavit that supported the search of his residence. Finding no merit to his claims, we will affirm the judgment of the district court.

Defendant George T. Rorrer ("Rorrer") was convicted by a jury of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). He argues that we lack jurisdiction over his case because his indictment failed to state an offense; that the district court erred by finding that there was sufficient evidence to convict him; that the court denied his right of allocution; that the court erred by not granting him a four-level downward departure under USSG § 3B1.2(a); that the court erred by increasing his offense level three levels under USSG § 2S1.1(b)(1) (1998); and that he is entitled to be resentenced under newly-issued amendments to USSG §§ 2S1.1 and 3B1.2. The United States cross-appeals, arguing that the district court erred by granting Rorrer a two-level downward departure under USSG § 3B1.2(b) and by declining to enhance Rorrer's sentence under USSG § 3B1.3. We find merit only to Rorrer's claim that he was denied his right of allocution, but we find meritorious those claims asserted by the United States.

### Statement of Facts [1]

*Floyd*

Keith Floyd met John Caporale in Louisville, Kentucky, in early 1995, and the two became good friends and then roommates. Floyd began supplying Caporale with cocaine for personal use. and soon he was selling him three to seven ounces a week, which Caporale would then resell. Caporale eventually wanted more than Floyd could provide, and began buying from others as well.

---

* The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

1. For purposes of the sufficiency of the evidence challenges asserted by Floyd and Rorrer, we view the evidence in the light most favorable to the prosecution, *United States v. Morrow*, 977 F.2d 222, 230 (6th Cir.1992), and we will consequently present those facts that the jury could have relied on in finding the defendants guilty.

In the summer of 1995 Floyd and Caporale flew from Louisville to Dallas to buy $5000 worth of cocaine from a man named P.K., a friend of Floyd's. They had someone drive Caporale's car to Dallas so they could drive the cocaine back to Louisville, but P.K. failed to produce the drugs. Caporale returned to Louisville by plane and Floyd drove back in Caporale's car, joined by an old college friend named David Jones, but this trip was interrupted when Jones fell asleep at the wheel and crashed the car, and P.K. drove the two back to Texas. Later the same year Floyd and Caporale again flew to Dallas to buy cocaine from P.K., this time $15,000 worth, but they returned empty-handed after they discovered that P.K. had been arrested.

After the second failed attempt to get cocaine from P.K., Floyd instead bought $5000 worth from a man named Keith Vaden, and thereafter he would occasionally buy half-kilograms from both Vaden and a man named Daryl. Floyd's main source, however, was one Doug Gardner: in a series of transactions beginning in late 1995, Floyd weekly bought a half-kilogram of cocaine from Gardner for $13,000. Floyd would then sell to Caporale, James Laws, Calvin Barber, and others, and they in turn would resell it on the street.

Though Jones had long known that Floyd dealt in cocaine. Jones never supplied Floyd with cocaine, nor vice versa. But it was through Floyd that Caporale and Jones became acquainted. Prior to Floyd's imprisonment, Jones began providing Caporale with marijuana from Texas as a way of paying off a $10,000 gambling debt, and after a while–shortly before Floyd went into prison–Jones began supplying Caporale with cocaine in an arrangement that lasted until April of 1999. Though this arrangement did not directly involve Floyd, nevertheless Jones was selling Caporale cocaine that the latter would otherwise have purchased from Floyd.

Floyd also introduced Jones to John Curtis Robertson. Jones began selling cocaine to Robertson at around the time Floyd went to prison.

Floyd sold cocaine to Laws from May of 1995 until he went to prison, two or three ounces every week or two. Laws, at the same time he was buying cocaine from Floyd, was also buying separately from Caporale. Laws also bought cocaine from Robertson, though it was unclear when he began doing so.

Floyd went to Kentucky prison in December of 1996 on a 25–year sentence for cocaine trafficking. While Floyd was in prison, Caporale deposited drug money into Floyd's bank account once a month, in Laws's name, but Caporale testified that he did it solely as a friendly gesture–because Floyd asked him for money, and not because of any drug arrangement with Floyd–and he concealed from Floyd the fact that it was drug money. Caporale for some reason also concealed from Floyd his cocaine distribution relationship with Jones, and he told his wife Jacqueline Caporale ("Jackie") to hide the relationship from Floyd. Nevertheless. Floyd learned of the relationship while he was in prison, from other people.[2]

On one occasion while Floyd was in prison, he talked with both Laws and Robertson in a three-way phone call. Floyd warned Laws (who was then buying cocaine from Robertson) that he should stop telling people that Robertson was a drug

---

**2.** During Rorrer's trial a DEA agent testified that in recordings of Floyd's telephone calls from prison, he "talked openly with different individuals about Mr. Caporale's operation," and he "named people that Mr. Caporale was dealing with."

dealer, since that type of carelessness was what had landed Floyd himself in jail.

*Robertson*

As noted above, after Floyd went to prison Caporale continued to deal drugs with both Jones and Laws. Beginning in 1997, Jones frequently sold Caporale one or two kilograms at a time, though this was later increased to ten kilograms per purchase. Robertson regularly bought from Caporale half or more of the drugs that Caporale purchased from Jones. Normally Jones and Caporale or Caporale and Robertson would arrange deliveries by calling each other on cellular phones and pagers, and Caporale would deliver the drugs to Robertson's house or a prearranged location. Caporale would pay Jones with both his own money and money Robertson had given him, and Jones could tell which was which because each had his own method of folding the bills. In total, Robertson purchased between 50 and 100 kilograms of cocaine from Caporale.

Robertson in turn sold his cocaine to Laws once or twice a month via a routine in which Laws would call Robertson's pager, Robertson would call him back, and the two would arrange a location for Robertson to pick up the drugs. They would also agree on a separate location–frequently, Robertson's apartment–for Laws to drop off the money.

On April 20, 1999, Jones traveled to Louisville to deliver four kilograms of cocaine to Caporale. Caporale's girlfriend, Jennifer McGiveney, drove to a Ramada Inn in Louisville where Jones was staying and picked up the drugs, which he had put into a black duffel bag with a red stripe. McGiveney then drove to Robertson's apartment to deliver the drugs to him and pick up approximately $90,000, which she was to return to Jones at the Ramada. McGiveney walked up to Robertson's front door holding the red-striped duffel bag and

knocked; Robertson answered. looked up and down the street, then admitted her. In the living room of the apartment Robertson dumped the four kilograms of cocaine from the duffel bag, and loaded $90,000 in cash into a different black duffel bag. McGiveney walked back to her car holding the bag, and then drove away–only to be apprehended by the police, who searched the car and found a duffel bag with $90,000 inside.

Not long after McGiveney was pulled over, Robertson emerged from his back door with a woman; she was carrying a black duffel bag with a red stripe. They were seen walking to the parking lot together, and the police stopped Robertson as he drove out of the complex–discovering to their surprise that neither the woman nor the duffel bag with the cocaine was in the car. The police returned with Robertson to his apartment, which they searched after obtaining a warrant. They discovered a nine millimeter handgun with fifteen live rounds in a console in the living room near the couch. They discovered no cocaine–either on Robertson's person, or in his car–though they did find a small amount of marijuana in his apartment. During the weeks leading up to April 20, 1999, on April 20, and during several days following April 20, hundreds of cellular phone calls and pages were made between Caporale, Robertson, Jones, and Laws.

*Rorrer*

In August of 1998, Caporale and Jackie went to the office of a Louisiana attorney named George Rorrer. Rorrer had previously done civil work for the Caporales and Jackie, and he knew of Caporale's drug involvement: Rorrer had represented Floyd in an appeal of a drug conviction, and in Floyd's trial associated with that appeal, Caporale had testified that he had possessed drugs and that he had himself been convicted of a drug offense. At the

August 1998 meeting, Caporale explained that he had $41,000 he wanted to invest with two others to open a local bar. Caporale told Rorrer that the $41,000 was drug money and that because he was more vulnerable as an investor, he wanted to arrange the transaction so that his co-investors could not take the money away. Rorrer suggested that the Caporales should incorporate in Jackie's name because she had a clean record and she was hence eligible to obtain a liquor license, and because by incorporating, Caporale could put his drug money into the entity and it would be easier to conceal his drug income. Rorrer also suggested that Caporale put money into the bank in $2500 installments to prevent the IRS from becoming curious. Though the bar investment possibility later fell through, Caporale asked Rorrer to let him know of any opportunities through which Caporale could "clean" his drug money.

About a week after the Caporales' office visit, Rorrer was contacted by a long-time client named Robin Hawkins, who explained that she was in financial straits, even to the extent that she had used her American Express card to finance the remodeling of one of the three tanning salons she owned, and that she needed someone to invest in her businesses or give her a loan. Rorrer had previously represented Hawkins in regard to her salons, and he was presently representing her in a divorce. Rorrer called Hawkins and suggested Caporale as an investor, and she agreed to a meeting.

Rorrer also called Caporale and explained that if he loaned Hawkins $29,000, she would repay him $34,000 in nine months, and, in Caporale's words, "the money would be clean money then." Though the $5000 profit was not as good as what Caporale could earn if he invested the money in cocaine, he nevertheless was enticed by the prospect of clean money, and he too agreed to a meeting.

On September 25, 1998, Hawkins, Caporale, Jackie, and Rorrer met in Rorrer's office in downtown Louisville. Jackie carried $29,000 to the meeting in a paper bag, the bills folded and rubber-banded into $1000 stacks. Prior to the meeting Rorrer had suggested to Caporale that he could write up a phony construction-work contract that would make it look like the $34,000 was not a loan, but a payment for remodeling work done on Hawkins's tanning salon by the Caporales. Caporale had agreed that this was a good way to assure that the money would be clean. Jackie and Hawkins signed the contract during the meeting, and Rorrer explained to Hawkins that she would have to provide the Caporales with her construction receipts at the time she repaid the loan. When Jackie asked for some evidence that they had actually loaned Hawkins the money, Rorrer drew up a promissory note which Jackie signed, but Rorrer gave neither party a copy of it.

After the Caporales left the office on September 25, Hawkins remained and Rorrer retrieved the bag of money from his desk, where he had stowed it when Jackie gave it to him at the beginning of the meeting. Rorrer reassured Hawkins that there was no need to take the rubber band off to count the money, because Caporale always folded his money in such a way that one could count it by observing how it was folded. Rorrer warned Hawkins that she should not deposit the money all at once because she would have to file a disclosure to the IRS, and instead he retained the money and returned it over the next few weeks–keeping $1000 for himself, apparently as a payment for arranging the loan. Hawkins testified that by the end of the meeting, she had a "pretty good idea" that Caporale's loan

money was drug money: Rorrer had called Caporale the "money man" for a "business" whose prior owner had gone to prison, and the fake construction contract indicated the need for subterfuge.

By June of 1999 Jackie was working with the DEA in its investigation of Caporale, and she she told authorities of Rorrer's involvement in the money laundering arrangement. On July 22, 1999, Jackie–equipped by the DEA with a transmitter and a digital recorder–went to Rorrer's office to talk about getting the money back from Hawkins. Jackie expressed concern about whether they could get the money back, because in legal proceedings Hawkins could simply point out that the Caporales had not done the remodeling work. This produced the following exchange, in which the subjects of drug money and laundering emerged for the first time, introduced in both instances by Rorrer:

> Rorrer: If Robin [Hawkins] ... if Robin ... says anything, ok, or, if you all are going to do anything if each of the other tries to push each other into a corner, and then somebody will start screaming it was drug money or something, ok ...
>
> Jackie: Does she know it was drug money?
>
> Rorrer: ... She is not stupid, okay ... Robin has got a lot of street smarts on her, uh, uh ... so then it becomes laundering all this other garbage goes on and everybody ends up in trouble and nobody wants to do that.

Later Rorrer indicated that the construction contract was a sham, designed to produce clean money:

> Rorrer: ... [Y]ou don't have to worry about the construction type stuff, because it is not going to get outside of you three.... The construction thing was just for cosmetic looks, you know ... like when this was given for value,

when in actuality it was just you guys lent 30 thousand bucks and you didn't do a damn thing for it ... so when you got paid back, it looks like you had earnings, clean money, ok....

> Jackie: So she couldn't go say that anyway ...
>
> Rorrer: Right, that is what I am saying, if she went in and said it, she admits that she was part, you know, part of a money laundering scheme.... [D]on't worry.

### Analysis

### I. Floyd

#### A. Sufficiency of the Evidence

"The relevant question in determining the sufficiency of the evidence to support a guilty verdict is whether 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Clark*, 928 F.2d 733, 736 (6th Cir.1991) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). To prove a drug conspiracy under 21 U.S.C. § 846, "the government must prove that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it." *United States v. Ledezma*, 26 F.3d 636, 640 (6th Cir.1994) (internal quotation marks and citations omitted). In this case, the indictment alleged a conspiracy between Floyd, Jones, Caporale, Abernathy (another seller who bought a small amount from Caporale), Laws, and Robertson.

Floyd argues that there was no joint venture with a common goal, because he never agreed to participate in a joint venture with the other members of the alleged conspiracy. Nevertheless, "[t]he government may demonstrate that a defendant

had the requisite knowledge by showing that defendant knew the essential object of the conspiracy." *United States v. Barrett,* 933 F.2d 355, 359 (6th Cir.1991). Drug conspiracies are often chain conspiracies, in which the drugs are sold down the line between buyers and sellers; in finding a conspiracy in such cases it is not necessary that each participant knew or was involved with all of the other levels, but it is necessary to find that each knew he was participating in a joint enterprise. *United States v. Davenport,* 808 F.2d 1212, 1215–16 (6th Cir.1987); *see also United States v. Bourjaily,* 781 F.2d 539, 544 (6th Cir.1986) ("One can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell."), *judgment aff'd* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). The district court in the present case gave a multiple conspiracy instruction:

> In deciding whether there ... [was] more than one conspiracy, you should concentrate on the nature of the agreement. To prove a single conspiracy, the Government must prove that each member ... agreed to participate in what he knew was a group activity, sometimes described as a collective venture, directed towards ... some common goal.

█ In this case there were a number of grounds upon which the jury could have found that Floyd was participating in a joint enterprise: Caporale began his cocaine-selling career by buying from Floyd, and he continued to buy from Floyd; Caporale sold the cocaine he bought from Floyd to other members of the alleged conspiracy; Floyd, Caporale, and Jones jointly participated in trips to Texas to buy cocaine; Floyd sold cocaine to Laws, who also bought from Caporale and Robertson; after Floyd was in prison, Caporale sent him money (which the jury could reasonably have understood as being in payment for drug transactions); and while in prison, Floyd had warned Laws not to tell other people that Robertson was a drug dealer. For the jury to find a conspiracy, it was not necessary that all of the members personally deal drugs with one another, and hence it is not dispositive that Floyd never personally bought or sold cocaine from Jones or Robertson. *See Davenport,* 808 F.2d at 1215–16. It suffices that there was evidence to find that all the conspirators knew they were involved in a joint enterprise to sell cocaine.

Floyd also argues that there must have been multiple conspiracies, because it was around the time he went to prison that Caporale began dealing cocaine with Jones, Laws, Abernathy, and Robertson. Since it is clear, as noted above, that Floyd was part of the conspiracy up until the time he went to prison, the questions are whether a new conspiracy began after he went to prison, or whether he withdrew by going to prison. Regarding the former possibility, the Sixth Circuit District Judges Association's pattern criminal jury instruction for determining whether there are multiple conspiracies–read to the jury by the judge in this case–explains that "a single conspiracy may exist even if different members joined at different times, or the membership of the group changed.... What is controlling is whether the government has proved that there was an overall agreement on a common goal." *See United States v. Maliszewski,* 161 F.3d 992, 1013–14 (6th Cir.1998). Here there was sufficient evidence for the jury to conclude that the common cocaine venture that Floyd was involved in prior to going to prison continued after he went to prison. Additionally, the fact that he received money from Caporale after he went to prison, and that he communicated from prison with members of the conspiracy

regarding drug matters, indicates that he continued his involvement in the same conspiracy, and did not withdraw. *See United States v. Lash,* 937 F.2d 1077, 1083 (6th Cir.1991).

### B. *Apprendi* Issues

■ Floyd argues that the district court violated *Apprendi* by imposing a 20–year mandatory minimum sentence based on the court's drug quantity finding, and by imposing a 10–year mandatory minimum term of supervised release. Since the time that Floyd filed his brief, however, the law in this area has become more clear, and Floyd's claims are no longer colorable. *See United States v. Leachman,* 309 F.3d 377, 378 (6th Cir.2002). Floyd also argues that the district court erred by refusing to credit him, under USSG § 5G1.3(b), with the full 48 months of imprisonment he had already served on a Kentucky conviction. The court credited him only partially, because it could not reduce his sentence below the mandatory minimum. But Floyd's argument fails, because it depends on the success of his *Apprendi* mandatory minimum argument. Floyd further argues that the district court erred by holding that his maximum term of imprisonment was 30 years, due to a prior conviction, though this conviction was not charged in the indictment. This, however, is clearly contrary to the holding of *Apprendi, see* 530 U.S. at 490, 120 S.Ct. 2348 and Floyd acknowledges that he raises the issue only to preserve it for Supreme Court review.

### C. Reduction for Acceptance of Responsibility

The district court gave Floyd a two-level reduction for acceptance of responsibility under USSG § 3E1.1(a), but denied him a three-level reduction under § 3E1.1(b) because "he did not cooperate concerning the specific offense charged." Floyd complains that the court did this merely because he chose to go to trial, and argues that this was error. Where–as here–the relevant facts are undisputed, we review *de novo* a district court's denial of a reduction for acceptance of responsibility. *United States v. Childers,* 86 F.3d 562, 563 (6th Cir.1996).

■ Among the requirements for a § 3E1.1(b) reduction is the following: "[T]imely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." USSG § 3E1.1(b)(2). Application note 2 to § 3E1.1 explains that these reductions are not meant to apply to defendants who take their case to trial, except in rare cases such as "where a defendant goes to trial to assert and prove issues that do not relate to factual guilt[.]" USSG § 3E1.1, cmt. n. 2. In this case Floyd chose to take his case to trial, and he challenged his factual guilt–evidenced, for example, by his sufficiency-of-the-evidence claim in the present appeal. He is consequently not entitled to a three-level reduction.

### II. Robertson

#### A. Two–Level Increase for Possessing a Gun

At sentencing, the district court found applicable the specific offense characteristic of gun possession, USSG § 2D1.1(b)(1), and the court increased Robertson's offense level two levels:

> On the weapon I find by the preponderance of the evidence that a weapon was present in the proximity of the drug transaction. I base this not only and less on the testimony of the co-conspirators whose credibility I questioned, I base it on the fact that the gun, a gun, was found in the console at the apart-

ment in the console of the couch of the apartment which was where the transaction took place. The two point firearm enhancement will be added to the base of 34 for a total level of 36.... I find the weapon was there. I base my finding not on the testimony of the co-conspirators, but primarily on what was found there.

"In order for § 2D1.1(b)(1) to be applicable, the government must establish (1) that the defendant 'possessed' the weapon, and (2) that such possession was during the commission of the offense." *United States v. Sanchez,* 928 F.2d 1450, 1460 (6th Cir.1991). Possession can be actual or constructive, and "[c]onstructive possession of an item is the 'ownership, or dominion or control' over the item itself, 'or dominion over the premises' where the item is located." *Id.* (quoting *United States v. Snyder,* 913 F.2d 300, 304 (6th Cir.1990)). We review for clear error the district court's determination that Robertson possessed a weapon in connection with the drug offense. *United States v. Keszthelyi,* 308 F.3d 557, 578–79 (6th Cir.2002).

■ Robertson argues that it was not adequately established that he possessed the gun *during* the drug transaction: the district court discounted the co-conspirators' testimony, and since it was only based on their testimony that the court could have found that a drug transaction took place in Robertson's living room and nowhere else, and that the gun was in the console at that time, the court's finding was unsupported. Nevertheless, the district court did not entirely discount the testimony of the co-conspirators: he stated that he based his finding "not only and less" on their testimony, and "primarily" on the presence of the gun. but he still allowed some credence to the co-conspira-

tors' testimony. Since the court's finding was based on credibility, and he did find them somewhat credible, we decline to reverse the court's decision.

B. *Apprendi* Violations

Robertson raises the same three *Apprendi* arguments advanced by Floyd, and they fail for the same reasons. He additionally argues that the trial testimony concerning quantity was insufficient to allow the trial court to make an informed and reliable determination of the appropriate quantity of drugs involved. Though he concedes that "[d]istrict courts may approximate the quantity of drugs for sentencing purposes based upon circumstantial evidence as long as they err on the side of caution." *United States v. Hernandez,* 227 F.3d 686, 699 (6th Cir.2000), he argues that the "unique posture of this case" renders his case different. It not entirely clear to what "unique posture" Robertson refers. He mentions both the fact that his trial began on the very day that *Apprendi* was handed down–apparently to make the point that his counsel did not know that the testimony the witnesses at trial might be used to establish quantity–and his belief that the trial testimony was subject to different interpretations regarding drug quantity. He also contends that even if we reject his interpretation of *Apprendi,* a district court errs by failing to conduct a post trial evidentiary hearing on quantity.

We conclude, however, that the sentencing court had adequate factual grounds for its finding of quantity, and that the court's finding is supported by the record. Additionally, Robertson's objection based on the inability to present and cross-examine witnesses is not well-taken: nothing precluded him from calling witnesses at sen-

tencing.[3]

### C. Adequacy of the Affidavit Supporting the Search of Robertson's Residence

■ The affidavit in question reported that on April 20, 1999, McGiveney had gone into Robertson's apartment with a bag, that she had emerged soon afterward carrying a different bag, and that she had been stopped soon afterward and the officers had recovered $90,000 in cash from that bag. The affidavit did not, however, report that soon after McGiveney had left, the affiant had observed a female exit the back door of Robertson's apartment carrying a bag resembling the one that McGiveney had entered carrying. Robertson argues that this omission eliminates probable cause, and renders the search of his apartment unconstitutional.

Though an omission of information may destroy probable cause, "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin,* 107 F.3d 1213, 1217 (6th Cir.1997). To establish that the affidavit was void because of omissions, Robertson had to demonstrate (1) that the affiant engaged in "deliberate falsehood" or "reckless disregard for the truth" in omitting information, and (2) that the affidavit, when considered with the omitted portions, did not establish probable cause. *Id.* at 1216–17 (citing *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). We review for clear error the district court's finding that the affiant did not act with deliberate falsehood or reckless disregard for the truth. *United*

*States v. Bonds,* 12 F.3d 540, 568–69 (6th Cir.1993).

Robertson argues that if the information had been included, the magistrate would have been compelled to conclude that when the same bag brought into the apartment was carried out soon afterward via the back door, the drugs were still in the bag and there was no probable cause to search the apartment. Robertson fails to establish, however, that the officer acted falsely or recklessly. When questioned about the omission at the hearing, the affiant believed that he had included the information, and it was only after re-inspecting the affidavit that he recognized the omission. We see no reason to find that the district court clearly erred in finding the affiant's assertion credible. Further, probable cause would have remained even if the information had been included, because Robertson quite possibly could have emptied some or all of the cocaine from the bag before handing it to the female who left carrying the bag.

### III. Rorrer

### A. Validity of Rorrer's Indictment

Rorrer argues that his money laundering conviction must be vacated because he was convicted for a "non-offense." Namely, his indictment states that he committed a number of acts in the course of and in furtherance of the conspiracy to launder money, but this was erroneous because "[s]ection 1956 does not make money laundering a continuing offense." *United States v. Marshall,* 248 F.3d 525, 540 (6th Cir.2001). Though Rorrer did not raise this argument before trial, or at any time before the district court, "failure to state an offense falls within the class of indict-

---

3. Robertson also argues that the district court erred by determining his drug quantity by a preponderance of the evidence, rather than by some higher standard. He acknowledges,

however, that his argument is contrary to our clear precedent, *see Hernandez,* 227 F.3d at 697, and raises the issue only for Supreme Court review.

ment defects that need not be brought before trial." *United States v. Harrod,* 168 F.3d 887, 890 (6th Cir.1999); *see also United States v. Adesida,* 129 F.3d 846, 850 (6th Cir.1997). We review de novo jurisdictional questions such as whether the indictment alleges a prosecutable offense. *United States v. Shafer,* 199 F.3d 826, 828 (6th Cir.1999).

■ Rorrer correctly identifies authority for the proposition that the crime of substantive money laundering is not a continuing offense, and that in such cases the government must allege and prove specific, discrete financial transactions. *See Marshall,* 248 F.3d at 540; *United States v. Kramer,* 73 F.3d 1067, 1072 (11th Cir. 1996); *United States v. Gray,* 101 F.Supp.2d 580, 585 (E.D.Tenn.2000). Nevertheless, Rorrer cites no authority for the proposition that the crime of *conspiracy* to launder money, under 18 U.S.C. § 1956(h), is not a continuing offense, nor are we aware of any. *See United States v. Edgecomb,* 910 F.2d 1309, 1312 (6th Cir.1990) (noting that "[c]onspiracy is a continuing crime."). We conclude that this challenge fails.

### B. Sufficiency of the Evidence

As we noted above, "[t]he relevant question in determining the sufficiency of the evidence to support a guilty verdict is whether 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Clark,* 928 F.2d at 736 (quoting *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781). "The essential elements of the crime of conspiracy are that the alleged conspiracy existed, the defendant willfully became a member, and one of the conspirators knowingly committed at least one alleged overt act in furtherance of some object or purpose of the conspiracy."

*United States v. Ross,* 190 F.3d 446, 450 (6th Cir.1999). The offense they conspired to commit was "concealment" money laundering under 18 U.S.C. § 1956 § (a)(1)(B)(i), the elements of which are (1) use of funds that are proceeds of unlawful activity; (2) knowledge that the funds are proceeds of unlawful activity; and (3) conduct or attempt to conduct a financial transaction, knowing that the transaction is designed in whole or in part to disguise the nature, location, source, ownership, or control of the proceeds.

*United States v. Moss,* 9 F.3d 543, 551 (6th Cir.1993).

■ Though there were significant disparities between Rorrer's own testimony and that of the government's witnesses against him, a reading of our statement of facts reveals that there was a great deal of evidence that a rational jury could have relied on in finding Rorrer guilty, not least of which is the recording of Rorrer himself introducing the terms "drug money" and "clean money" in his conversation with Jackie. We find no error.

### C. Right of Allocution

Fed.R.Crim.P. 32(c)(3)(C) requires that before imposing sentence, the court must "address the defendant personally and determine whether the defendant wishes to make a statement and to present any information in mitigation of the sentence." We review de novo a defendant's claim that he was denied the right of allocution. *United States v. Wolfe,* 71 F.3d 611, 614 (6th Cir.1995).

■ The government notes–as an example of the district judge's allocution method–that prior to sentencing Floyd he addressed him as follows: "Those are my rulings. Is there anything further before sentence is imposed, Mr. [Floyd]?" Floyd

said, "No," then the judge said, "Nothing further?" and then Floyd's counsel began to speak. In Rorrer's sentencing, the judge said merely, "Is there anything further?" The record of course does not evidence whether the judge was looking at Rorrer when he said this, but the government argues that when he said it he was addressing Rorrer. Nevertheless, Rorrer's counsel answered on his behalf: "No, Your Honor." The judge then delivered the sentence. When he finished, the prosecutor addressed the court:

> I just wanted to, before we conclude, since there is a likelihood of appeal on this issue, I want to be sure the record is clear for the United States.... I would ask the Court to ensure that the waiver to allocute is from the Defendant in this case. I know [Rorrer's counsel] said there was nothing else, but since we need to make sure this is picture perfect on the record, if we could have the Defendant acknowledge that he does not acknowledge to address the Court personally.

Rorrer then replied, "No, sir." Again, it is not evident who was looking at whom when Rorrer made his statement.

Rorrer, in his brief, argues that "[t]he Court never addressed the Appellant personally during any of the three sentencing hearings in this case," and the only time he "was addressed during sentencing was by the Assistant United States Attorney." Rorrer notes that Rule 32 requires that the district court address the defendant *before* imposing sentence, and argues that his answer "No, sir" was directed to the United States Attorney, and indicated that he meant "No, I have not waived my right to allocution."

The Supreme Court has indicated that to satisfy the minimal requirements of what is now Rule 32(c)(3)(C), the record must reveal that the court gave the defen-

dant the opportunity to speak–though a yet clearer record is desirable:

> [t]he single pertinent sentence–the trial judge's question "Did you want to say something?"–may well have been directed to the defendant and not to his counsel. A record, certainly this record, unlike a play, is unaccompanied with stage directions which may tell the significant cast of the eye or the nod of the head. It may well be that the defendant himself was recognized and sufficiently apprised of his right to speak and chose to exercise this right through his counsel. Especially is this conclusion warranted by the fact that the defendant has raised this claim seven years after the occurrence. The defendant has failed to meet his burden of showing that he was not accorded the personal right which Rule 32(a) guarantees, and we therefore find that his sentence was not illegal.

*Green v. United States,* 365 U.S. 301, 304–05, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961). The Court then explained the way allocution ought to be carried out:

> [T]o avoid litigation arising out of ambiguous records in order to determine whether the trial judge did address himself to the defendant personally, we think that the problem should be, as it readily can be, taken out of the realm of controversy. This is easily accomplished. Trial judges before sentencing should, as a matter of good judicial administration, unambiguously address themselves to the defendant. Hereafter trial judges should leave no room for doubt that the defendant has been issued a personal invitation to speak prior to sentencing.

*Id.* at 305, 81 S.Ct. 653; *see also United States v. Thomas,* 875 F.2d 559, 561–63 (6th Cir.1989) (finding that the minimal requirements of Rule 32(c)(3)(C) were satisfied where the district court informed the

defendants that either they or their counsel could respond, but adding–in dicta–that "[b]efore the conclusion of the sentencing hearing, *the district court judge must personally and unambiguously invite the defendant to speak in his own behalf.*") (emphasis in original).

Here, the court was apparently in the habit of conducting allocution by asking the defendant whether he had anything further to say, but the record does not reveal whether he was specifically addressing Rorrer when he asked the question, and it was Rorrer's counsel who responded on Rorrer's behalf. Further, the government's attempt to cure the ambiguity was also ambiguous, and it occurred after the court had delivered its sentence. Although Rorrer had himself performed criminal defense work, and would have been well aware of his right to address the court, and although all the parties concerned–the court, the government, and Rorrer–appear to have understood that the only problem with regard to allocution was that the record was unclear (and not that the court had failed to address Rorrer at all, or that the substance of the allocution was in any way defective) we cannot say that the record clearly supports a finding that the minimal requirements of Rule 32(c)(3)(C) were satisfied.

### D. Whether Rorrer Played a Minimal Role

USSG § 3B1.2 provides for a two- or four-level decrease if the defendant was a minor or minimal participant in the criminal activity. The United States, in its cross-appeal, argues that the district court erred by granting Rorrer a two-level decrease under this section, and contends that the court should have granted no decrease at all; Rorrer also complains of the two-level decrease, but he argues that it should have been a four-level decrease. We review for clear error a district court's decisions regarding reductions for the role a defendant played in an offense, though "[w]here the district court fails to articulate the reasons for the enhancement, a de novo review is necessary to 'determine whether the enhancement is applicable, or whether remand for further findings is required.'" *United States v. Caseslorente,* 220 F.3d 727, 734 (6th Cir.2000) (quoting *United States v. Vandeberg,* 201 F.3d 805, 811 n. 2 (6th Cir.2000)).

The Guidelines' Commentary explains that the four-level decrease is for a defendant

> who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant. It is intended that the downward adjustment for a minimal participant will be used infrequently.

USSG § 3B1.2, cmt. nn. 1–2. The Commentary additionally explains that the two-level decrease for being a minor participant is for a defendant "who is less culpable than most other participants, but whose role could not be described as minimal." *Id.* cmt. n. 5. To determine whether a defendant played either role, the court should inquire into the defendant's role in the portion of the overall conspiracy that was attributable to the defendant in calculating his base offense level. *United States v. Salgado,* 250 F.3d 438, 458 (6th Cir.2001); *see also United States v. Roper,* 135 F.3d 430, 434 (6th Cir.1998). Rorrer was held responsible only for the money laundering scheme, so the relevant inquiry is whether he played a minor role in the

money laundering deal, rather than in the conspiracy as a whole.

In Rorrer's presentence report, the probation officer concluded that a mitigating role adjustment was not warranted: "it does not appear that the defendant was substantially less culpable than the average participant with regard to money laundering as he brought the parties together, prepared legal documents to support the construction concealed loan agreement, and used his attorney escrow account to distribute the money." At sentencing, however, the district court announced without further explanation that "considering the money laundering scheme, the Court has concluded the Defendant's role was minor and he is entitled to a two-level reduction under 3B1.2(b)."

■ The court's conclusion appears to lack a foundation, however, given that Rorrer, far from being less culpable in the money laundering than the other participants, was in fact the central figure in the operation: he instigated the transaction by connecting Hawkins and Caporale; he facilitated it by writing a phony contract; and he offered his own office space to complete the transaction. All that Caporale had to do was to walk in with the money, and sign on the dotted line. We conclude that the district court clearly erred in granting a two-level decrease for being a minimal participant.

Our conclusion is strengthened by indications that the district court granted the decrease for reasons of fairness, rather than because Rorrer deserved it under the Guidelines. The district court considered Rorrer's sentence in three hearings, and the record of these hearings indicates that the court said nothing specific about the minor role departure, yet the court repeatedly indicated that Rorrer's sentence was too severe in comparison with those of his co-defendants, particularly that of

Scott Schuman. (Schuman was charged with money laundering for an arrangement in which Schuman provided Caporale with false paychecks from Schuman's business, but he ultimately pleaded guilty to making a false statement and received probation.) There were numerous evidences of the court's predisposition to compare sentences, and to grant Rorrer a lighter sentence than the Guidelines appeared to dictate: the court granted Rorrer's request to continue his sentencing until after Schuman had been sentenced, so it could consider the two together; when the prosecutor reminded the court that comparative sentencing was legally improper, the district court (on two occasions) remarked that comparative sentencing might nevertheless be "practically" proper; Rorrer's counsel made the most of the court's concern by comparing Rorrer's money laundering to Schuman's, and arguing that Schuman's laundering was in the heartland of money laundering and Rorrer's was not; after Schuman had been sentenced, the court expressed concern about the disparate nature of the sentencing of the various defendants; the court repeatedly allowed and even invited the parties to discuss the practical fairness of the comparative sentences; and the court granted the decrease without explanation. Though the court's concern for objective fairness is laudable, it was not at liberty to grant Rorrer unmerited decreases to achieve this objective. *See* USSG § 5K2.0, cmt. (noting that "dissatisfaction with the available sentencing range or a preference for a different sentence than that authorized by the guidelines is not an appropriate basis for a sentence outside the applicable guideline range"); *United States v. LaSalle*, 948 F.2d 215, 217 (6th Cir.1991).

E. Enhancement for Use of a Special Skill

■ The United States also cross-appeals the district court's refusal to add two

levels pursuant to USSG § 3B1.3, which provides for a two-level increase "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense[.]" The presentence report found that Rorrer both abused a position of trust *and* used a special skill: in relation to an abuse of trust, Hawkins looked up to Rorrer as an adviser, and in relation to a special skill, Rorrer's "special training in law was used to draft the contract and construct the transaction to accomplish the money laundering." Nevertheless, at the sentencing hearing the district court announced, without explanation, that the "two-level enhancement for abuse of position of trust or use of special skills does not apply."

We review for clear error a district court's factual finding regarding application of § 3B1.3 (1998). *United States v. Lewis,* 156 F.3d 656, 658 (6th Cir.1998) (quoting *Atkin,* 107 F.3d at 1219). According to the Guidelines commentary, the term " '[s]pecial skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, *lawyers,* doctors, accountants, chemists, and demolition experts." USSG § 3B1.3, cmt. n. 3 (emphasis added).

We find that the district court acted contrary to the manifest weight of the evidence in holding that Rorrer used no special skill. It is apparent that lawyering is a special skill, and Rorrer used that skill in accomplishing this transaction when he brought the parties together, recommended that they launder the money via a false construction contract, drew up that contract, and recommended to Hawkins that she deposit the money in small amounts to conceal the transaction from the IRS. Rorrer argues that the contract he drew up was a simple one, the kind anyone could purchase at an office store, but he overlooks the fact that he was the one who conceived the scheme of laundering the money through such a contract, and he advised the parties that they would need to verify the arrangement through receipts. We conclude that Rorrer used his special skill as an attorney, and the district court clearly erred in finding otherwise. And as above, our conclusion is supported–and the district court's odd and unexplained finding is explained–by the court's evident desire to grant Rorrer a reduced sentence.

### F. Application of Amendments

█ Rorrer argues that he should be resentenced under Amendment 634, which changes calculation of the offense level for money laundering in USSG § 2S1.1. This amendment became effective approximately 10 months after he was sentenced. Nevertheless, as we noted in a recent unpublished opinion, *see United States v. McLain,* 48 Fed.Appx. 976 (6th Cir. Oct. 22, 2002). Amendment 634 is not retroactive because it is not included in the USSG § 1B1.10(c) list of retroactive amendments, and it is also a substantive as opposed to a merely clarifying change. *Id.* at 977; *see also United States v. Murillo–Iniguez,* 318 F.3d 709 (6th Cir.2003) (explaining that where the modification is substantive and there is no suggestion that the change is retroactive, then the court should apply the sentencing guideline in effect at the time of sentencing). We decline to apply this amendment, and, for purposes of judicial economy, the district court should not consider the amendment on remand.

Rorrer also contends that he should be resentenced under Amendment 635, which "resolves a circuit conflict regarding whether a defendant who is accountable

under § 1B1.3 (Relevant Conduct) only for conduct in which the defendant personally was involved, and who performs a limited function in concerted criminal activity, is precluded from consideration for an adjustment under § 3B1.2 (Mitigating Role)." USSG Supp. to App. C, amend. 635, at 238 (2001). Even without delving into the question of whether this amendment is retroactive (and we note that it is not included in the USSG § 1B1.10(c) list), it is evident that the amendment does nothing for Rorrer: not only was he personally involved in the money laundering conspiracy, he played a major role in that conspiracy. Consequently, on remand the district court should not consider the application of this amendment either.

## Conclusion

We AFFIRM the judgment of the district court with respect to the convictions and sentences of Floyd and Robertson. We AFFIRM Rorrer's conviction and sentence except with respect to the errors in sentencing raised by the United States in its cross-appeal. We therefore VACATE Rorrer's sentence and REMAND to the district court with instructions to resentence Rorrer in accordance with this opinion, and we suggest that the district court ensure that the record of the resentencing procedures reflect the explicit offer to Rorrer of the opportunity to allocute.