**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0728n.06

No. 14-6405

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 02, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| BALTAZAR CAMACHO, | ) | |
| | ) | **OPINION** |
| **Defendant-Appellant.** | ) | |
| | ) | |

Before: KEITH, CLAY, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Baltazar Camacho challenges his within-Guidelines 470-month aggregate sentence as procedurally unreasonable. We affirm.

**I.**

After a grand jury indicted Camacho and fifteen others with various drug and money-laundering charges, Camacho pleaded guilty of possession with intent to distribute more than 280 grams of cocaine base (crack) and five kilograms or more of a mixture containing a detectable amount of cocaine (count 1), 21 U.S.C. § 846, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), and conspiracy to commit money laundering (count 23), 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), and (h).

The Presentence Report (PSR) recommended a life sentence, capped at 470 months, calculated on a base offense level of 38 and criminal history category I. Camacho objected to the PSR's description of the offense conduct (PSR paragraphs 17 through 21), the calculation of the

drug quantity on which the base offense level was based (150 kilograms of cocaine), the four-level "organizer or leader" role enhancement, and the two-level enhancement for possessing a firearm in the commission of a drug trafficking crime.

## II.

The district court held an evidentiary hearing at which the Government called several of Camacho's co-conspirators and a member of the investigating FBI task force to address Camacho's objections to the PSR.[1] That testimony included that in late 2010, Camacho met with an Atlanta-based cocaine supplier, Miguel Gomez (Miguel), who agreed to supply him with cocaine. Shortly after, Miguel sent two of his associates, Noe Perez Rosales (Perez) and Aquileo Vivanco Villa (Vivanco), to assist and keep an eye on Camacho. Miguel paid Vivanco for three weeks, at which point Camacho offered Vivanco a job. Camacho also had a driver, Ivan Hernandez (Hernandez), who drove him to cocaine deals and occasionally made deliveries for him. According to Vivanco, Miguel sent Camacho four to six kilograms of cocaine once or twice a week for about eight months until Miguel's shipments stopped in early 2011.

During this first period (late 2010 to early 2011), Camacho paid Perez and Vivanco to assist him in receiving, measuring, packaging, and distributing the cocaine. Also during this period, Perez and Vivanco began dealing with Sergio Gomez, a low-level drug dealer who would become one of Camacho's biggest clients. Sergio Gomez would buy cocaine from Perez and Vivanco before selling it to dealers including Kendall Cox (Cox), who would cook a portion into crack cocaine before selling it to his own customers. Sometime after his first buy from Sergio

---

[1] Sentencing began on October 17, 2014, and concluded on November 4, 2014.

Gomez, Cox figured out that Sergio Gomez was getting his cocaine from Camacho and that Vivanco (whom Cox knew as "Primo") and Perez were involved with Camacho. Cox estimated that during this period he bought three or four kilograms every one-and-a-half weeks for around three months from Camacho, through Sergio Gomez.

Before Miguel's shipments stopped, Camacho had been looking for additional suppliers in Atlanta who could supply cocaine at a lower price than Miguel. After Miguel's shipments stopped, Camacho began making trips once or twice a week to Atlanta, always with Perez, Vivanco, or Hernandez, and often returned with two kilos of cocaine. This lasted for about three to four months, at which point Perez left Camacho's employ, followed by Vivanco about six months later. Perez explained that he left because Camacho was a complicated, somewhat aggressive person, and Vivanco testified that Camacho would waive a black gun around when he drank and had fired it out of a car window at least once. Perez similarly testified that Camacho fired the weapon out a car window into the air.

Vivanco testified that Camacho always carried the black firearm when they "were drugging," and Perez testified that he saw Camacho carrying the firearm during some drug deals. Both Perez and Vivanco testified that Camacho informed them that the weapon was a nine-millimeter pistol and that he carried it to keep the drugs safe.

After leaving Camacho's employ, Perez and Vivanco jointly distributed cocaine to Sergio Gomez and Cox, among others, for about one-and-a-half months. After Perez and Vivanco were arrested in Kentucky in October 2011, Sergio Gomez and Cox began dealing with Camacho again. Sergio Gomez brokered deals between Camacho and Cox, and Cox would test the

cocaine's purity by microwaving about an ounce of each kilo into crack cocaine. On one occasion, Camacho brought Cox a microwave for that purpose.

Cox testified that he would test an ounce of each kilo of cocaine by "cooking it up," looking "[f]or the substance to come back to a certain weight and come back hard, real hard." If he cooked an ounce (28.349 grams), he would need from twenty-six to twenty-eight grams to come back hard. While Cox cooked samplings of the various cocaine buys, Camacho was usually counting money; Cox always paid Camacho in cash. Cox testified that he could tell that Camacho was in charge of Vivanco and Perez because Camacho "always took the money with him."

Cox testified that initially he would cook around seventy-five percent of the cocaine into crack, but that toward the end of the criminal enterprise, when he was buying up to six or seven kilograms of cocaine every week-and-a-half from Camacho via Sergio Gomez, he was selling more powder cocaine and the ratio was "[p]robably like 50-50.

Cox was arrested in August 2012 and entered into a plea agreement under which he pleaded guilty of conspiring to distribute powder and crack cocaine in exchange for the Government dropping five cocaine distribution charges. He faced about twenty years in prison when he testified at Camacho's sentencing. He testified that in the period immediately preceding his arrest, when he was back purchasing cocaine from Camacho through Sergio Gomez, he bought "[p]robably like maybe 40, 50 kilos." All told, he bought sixty to sixty-seven kilograms of cocaine from Camacho. Cox never saw Camacho brandish a weapon, but did see Camacho's "shirt bulging out, you know, like a gun was right there."

Detective Jarrod Whitson, a member of the FBI task force that investigated Camacho and others for one-and-a-half to two years, testified that that the first phone wiretapped was Cox's and that about a month later, Cox referred to "Balta" during a phone conversation with Sergio Gomez, whose phones were also wiretapped. During a later phone conversation between Sergio Gomez and Camacho, Camacho said he was not happy that Cox knew his real name and asked Sergio Gomez to refer to him as "Jose Luis."

Detective Whitson testified that the task force learned that Camacho had been arrested previously in the Knoxville area when the name "Baltazar" was run through the Knox County Jail intake system, after which it obtained a photograph of Camacho. Whitson later saw Camacho appear on surveillance tapes. At that point, the task force focused on Camacho, believing that he was the main cocaine supplier.

Detective Whitson opined that Camacho was a large-scale drug trafficker; "the top of the chain here in Knoxville." Camacho's supply of cocaine came from Mexico to Atlanta, "the hub for most of the drugs in the Eastern Seaboard." By tracking Camacho's cell phones, a number of which he stopped using altogether or dumped, the task force learned that Camacho traveled to Atlanta every four days or so, while his employees remained in the Knoxville area serving customers. Several photographs of Camacho in a hat or cap and dark sunglasses were admitted in evidence, some taken in Knoxville and some in Atlanta.

Detective Whitson testified that in 2010, a Harley-Davidson edition Ford pickup truck registered to Camacho was seized pursuant to a DEA search warrant. A search of the apartment Camacho lived in yielded around a kilogram of powder cocaine, keys to the pickup truck,

Camacho's driver license, and two pistols. From that point on, Camacho never registered another vehicle in his name.

Based on the foregoing, Detective Whitson opined that Camacho distributed more than 450 kilograms of cocaine in Knoxville during this conspiracy, that he sold approximately half that amount to co-conspirators, and that Cox bought 80 to 100 kilograms of the 150 kilograms Camacho distributed through Sergio Gomez. Whitson further opined that Camacho had to have been armed during his drug dealings because otherwise he would have been killed or robbed of the large amounts of cash or cocaine he carried.

Finally, Whitson testified that Camacho disappeared from the Knoxville area but surfaced in Atlanta when he was arrested on a DUI charge.

## III.

Following the evidentiary hearing, the probation officer responded to Camacho's objections to the PSR, applying the 2014 version of the Guidelines, as Camacho requested. The probation officer recommended that Camacho's base offense level remain at 38:

> Testimony provided during the October 17, 2014, sentencing hearing conveyed that much of the cocaine the defendant sold was later cooked into crack cocaine. Co-conspirator Kendall Cox testified that he was purchasing approximately two to four kilograms of cocaine every seven to ten days from the defendant during the course of the conspiracy (August 2010 to August 2012). He also testified that on at least one occasion, he made a seven kilogram purchase of cocaine from the defendant. Cox went on to state that during the beginning of this conspiracy, he was cooking approximately 75 percent of the cocaine he received from the defendant into cocaine base. Near the end of the conspiracy, he related he was cooking approximately 50 percent of the cocaine he received from the defendant into cocaine base. Therefore, it is the position of the probation officer that the defendant is responsible for a cocaine base amount of at least 25.2 kilograms, which is a conservative reflection of the cocaine that was cooked into crack

cocaine by co-defendant Cox over the course of the conspiracy. No changes will be made to the [PSR] at this time.

Second addendum to PSR/R. 9-5, p. 21.

The district court concluded that Camacho was responsible for the distribution of 25.2 kilograms of crack cocaine; a threshold amount for applying a base offense level of 38 under U.S.S.G. § 2D1(c)(1). The court also applied a four-level "leader and organizer" enhancement, § 3BG1.1(a), and a two-level enhancement for possessing a firearm in connection with a drug-trafficking offense, § 2D1.1(b)(1). On appeal, Camacho argues the district court erred in calculating the drug quantity attributable to him and in imposing the two enhancements. A challenge to a Sentencing Guidelines calculation is a challenge to the procedural reasonableness of a sentence. *United States v. Johnson*, 732 F.3d 577, 580 (6th Cir. 2013).

## IV. Drug Quantity

"The determination of the relevant drug quantity is ordinarily a finding of fact but when the precise quantity is uncertain, the district court may estimate so long as its estimate is supported by a preponderance of the evidence." *United States v. Patterson*, 607 F. App'x 537, 539 (6th Cir. 2015) (citing *Johnson*, 732 F.3d at 580)).

The 2014 version of the Sentencing Guidelines links a drug-trafficking defendant's base offense level to the quantity of drugs involved in the offense. *See* U.S.S.G. § 2D1.1(a), (c). A base offense level of 38 corresponds to both 450 kilograms or more of powder cocaine and 25.2 kilograms or more of cocaine base (crack). *Id.* at § 2D1.1(c). A defendant who participates in a drug conspiracy is responsible for the drug quantity he personally distributed as well as "all

reasonably foreseeable acts . . . of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

**A.**

Camacho argues that insufficient proof was presented at sentencing to establish that he was responsible for the distribution of 25.2 kilograms or more of crack. He asserts that this court should remand for resentencing applying a base offense level of 34, corresponding to 50 to 100 kilograms of cocaine, U.S.S.G. § 2D1.1(c)(1), because "[t]he only real sustainable proof regarding powder cocaine" was Sergio's testimony that he received between 50 and 150 kilograms of cocaine from Camacho, which amount includes sales to Cox.

**B.**

The district court held Camacho responsible for 25.2 kilograms of crack cocaine, a conservative estimate of the amount distributed only by Cox:

> The Court gives some consideration to whether the Government has shown by a preponderance of the evidence . . . the Defendant being part of a cocaine distribution conspiracy involving greater than 450 kilograms of cocaine. The Court does believe, based on the evidence before it, it could potentially reach that conclusion as opposed to a lesser conclusion.
>
> [] [B]ut the Court finds it unnecessary to reach that conclusion, given the conclusions that it's prepared to make regarding the Defendant's responsibility with respect to the crack cocaine based on the evidence before the Court.
> . . . .
> [] The Court finds the Defendant was sometimes present when cocaine was distributed to Mr. Cox. When receiving powder cocaine, Mr. Cox would take a portion of the cocaine and cook it into crack in order to test it before accepting the cocaine. The Court finds the Defendant knew or should have known the cocaine being distributed to Mr. Cox was being converted into crack cocaine and thereafter distributed.

Accordingly, pursuant to Section 1B1.3 of the Sentencing Guidelines, the Court finds the Defendant aided and abetted Mr. Cox's distribution of crack cocaine by supplying the cocaine from which the crack was derived.

Additionally, the Court finds that the Defendant, Mr. Cox, and others, jointly undertook criminal activity and the Defendant could reasonably foresee that crack cocaine would be distributed.

Turning to the amount of crack cocaine the Defendant is responsible for, under Section 2G1.1 of the guidelines . . . the Court would find that Mr. Cox cooked a conservative estimate of 50 per cent of the cocaine he received into crack cocaine.

The Court notes Mr. Cox would only accept cocaine that converted to crack at 26 grams out of 28 grams, or more than a nine to ten ratio. The Court finds that Mr. Cox received cocaine from the Defendant and those working in concert with the Defendant in two different periods of time, spanning from in or about late 2010 to early 2011 and then late 2011 to March, 2012.

For the first period of time, the Court would conclude from the evidence presented, that Mr. Cox received three to four kilograms every week or week and a half for three months, giving a conservative estimate of 27 kilograms of cocaine, 13.5 kilograms of which he would cook into crack cocaine.

For the second period of time, Mr. Cox received three to four kilograms per week or week and a half, increasing to six to seven kilograms for about four months, yielding a conservative estimate of 36 kilograms of cocaine, 18 kilograms of which he cooked into crack.

Adding the two periods of time together, the Court would find that Mr. Cox cooked a conservative estimate of 31.5 kilograms of the cocaine he received from the Defendant into crack cocaine; and giving the Defendant the benefit of a nine to ten conversion ratio, that Mr. Cox cooked and distributed a conservative estimate of 28 kilograms of crack, based on the cocaine he received from the Defendant.

The Court would hasten to add, based on its review of the evidence and consideration of the testimony and arguments, that it finds this estimate likely significantly underestimates the amount of crack cocaine attributable to this defendant.

9

> Therefore, the Court does find the Defendant is responsible for the distribution of 25.2 kilograms or more of cocaine base. And pursuant to Section 2B1.1 of the Sentencing Guidelines, the Court finds the Defendant's base offense level is 38.

PID 3436–39.

In sum, Sergio Gomez testified that he purchased from Camacho or Camacho's employees between fifty and eighty kilograms of cocaine for Cox alone. Cox testified that he bought three to four kilograms of cocaine about every week and a half for about three months during the first period (late 2010 to early 2011), and that that amount increased to six to seven kilograms over four months during the second period (late 2011 to March 2012). Cox estimated that in total he bought around sixty to sixty-seven kilograms from Camacho through Sergio Gomez over the course of the conspiracy. Cox also testified that initially he cooked around seventy-five percent of the powder cocaine into crack, but that by the end of the conspiracy, that ratio had changed to around 50-50. The district court conservatively estimated that Cox cooked 31.5 kilograms of cocaine into crack, estimating that Cox bought twenty-seven kilograms of cocaine during the first period and thirty-six kilograms during the second period, and cooked half of the sixty-three kilogram total, 31.5 kilograms, into crack. A preponderance of the evidence supported the district court's conservative estimation. *See Johnson*, 732 F.3d at 580; *Patterson*, 607 F. App'x at 539.

## V. Leadership Role

Camacho challenges the district court's application of a four-level "aggravating role" enhancement, arguing that Miguel, not Camacho, was the leader of this conspiracy. Review of the district court's application of a § 3B1.1(a)(1) enhancement is deferential. *United States v.*

*Washington*, 715 F.3d 975, 983 (6th Cir. 2013) (an organizer or leader enhancement "depends on a number of factual nuances that a district court is better positioned to evaluate").

The Sentencing Guidelines call for a four-level enhancement when the defendant was an organizer or leader of a criminal activity involving five or more participants.[2] U.S.S.G. § 3B1.1(a).

We find no error. A defendant only has to exercise control of a single participant in order to receive a leadership role enhancement, *United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir 2012), *United States v. Baker*, 559 F.3d 443, 449 (6th Cir. 2009), and both Perez and Vivanco testified that they worked for and were paid by Camacho for, among other things, packaging and delivering cocaine. In addition, Camacho employed Ivan Hernandez as a driver. Further, Camacho continued to distribute cocaine well after Miguel's shipments stopped in early 2011. Thus, Camacho's argument that Miguel was the sole leader of the conspiracy is unavailing.

## VI. Firearm

Camacho also argues that the Government presented insufficient evidence that he possessed a firearm in the course of criminal activity. We review for clear error the district court's determination that Camacho possessed a firearm in connection with a drug-trafficking offense. *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008).

Section 2D1.1(b)(1) of the Sentencing Guidelines provides for a two-level enhancement if a firearm was possessed during the commission of a drug offense. *Id.* The Government must

---

[2] Camacho does not dispute that there were five or more participants. Appellant Br. 36.

establish by a preponderance of the evidence that Camacho actually or constructively possessed a weapon. *United States v. Miggins*, 302 F.3d 384, 390–91 (6th Cir. 2002).

Here, Perez and Vivanco's testimony that Camacho armed himself during some or all of the cocaine transactions at which they were present was unrebutted. Thus, a presumption arose that such possession was connected to the offense, and the burden shifted to Camacho to demonstrate that it was clearly improbable that the weapon was connected to the offense. *Id.* at 391. Camacho did not meet this burden. On appeal, he simply argues that his co-defendants are unreliable witnesses, and Investigator Whitson's testimony is pure speculation. Appellant Br. 5.

We find no clear error. The district court reasonably relied on Perez and Vivanco's testimony to conclude that Camacho possessed a firearm in connection with his drug-trafficking offense. *See, e.g., United States v. Robertson*, 67 F. App'x 257, 267 (6th Cir. 2003) (affirming application of the firearm enhancement based only on co-conspirator testimony that district court found "somewhat credible.").

## VII.

For these reasons, we affirm Camacho's sentence.